586 F.2d 266
 TOWN COURT NURSING CENTER, INC., Appellant in No. 77-2221,
and Emma Cooper, Mary Crawford, Hazel Kemp, Arnold L.
Phillips, Delphine Taddei, Nancy Truitt, Individually and on
behalf of the class of patients eligible for Pennsylvania
Medical Assistance Program benefits at Town Court Nursing Center, Inc.
v.
Frank S. BEAL, Individually and in his capacity as Secretary
of Public Welfare of the Commonwealth of Pennsylvania and
Joseph A. Califano, Jr., Individually and in his capacity as
Secretary of the United States Department of Health,
Education, and Welfare.
Appeal of Joseph A. CALIFANO, Jr., Secretary of the United
States Department of Health, Education, and
Welfare, in No. 77-2444.
 Nos. 77-2221 and 77-2444.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 4, 1978.
Resubmitted In Banc July 10, 1978.
Decided Sept. 29, 1978.
 
 Nathan L. Posner, Jeffrey B. Albert, Barry Applebaum, Fox, Rothschild, O'Brien & Frankel, Philadelphia, Pa., for Town Court Nursing Center, Inc., appellant.
 William F. Coyle, Philadelphia, Pa., for Emma Cooper, et al., appellees.
 Maria Parisi Vickers, Asst. Atty. Gen., Michael von Moschzisker, Deputy Atty. Gen., Eastern Regional Director, Robert P. Kane, Atty. Gen., Philadelphia, Pa., for Frank S. Beal.
 David W. Marston, U. S. Atty., Walter S. Batty, Jr., Chief, App. Section, Robert N. Deluca, Chief, Civ. Div., Philadelphia, Pa., for Joseph A. Califano, Jr.; Stephanie W. Naidoff, Regional Atty., Margaret M. Hathaway, Asst. Regional Atty., Dept. of Health, Ed. and Welfare, Philadelphia, Pa., of counsel.
 Argued Jan. 4, 1978.
 Before SEITZ, Chief Judge, and GIBBONS and GARTH, Circuit Judges.
 Resubmitted In Banc July 10, 1978.
 Before SEITZ, Chief Judge, and ALDISERT, ADAMS, GIBBONS, ROSENN, HUNTER, WEIS, GARTH and HIGGINBOTHAM, Circuit Judges.
 OPINION OF THE COURT
 SEITZ, Chief Judge.
 
 
 1
 One of the plaintiffs below, Town Court Nursing Center, Inc. ("Town Court") appeals from an order of the district court denying plaintiffs' motion to extend portions of a preliminary injunction entered during an earlier phase of the litigation. The effect of the order from which Town Court appeals was to remove those portions of the injunction that had prevented defendants below, Secretary of Health, Education, and Welfare Joseph A. Califano, Jr., ("Secretary Califano") and Pennsylvania's Secretary of Public Welfare Frank S. Beal ("Secretary Beal"), from removing certain patients from Town Court and from prohibiting the placement of new patients at Town Court.
 
 
 2
 The district court did grant certain relief presumably both to Town Court and to its patients. Secretary Califano cross-appealed therefrom (No. 77-2444). To the extent his cross-appeal involved the rights of the patients it is governed by Judge Aldisert's announced judgment in his opinion filed today. To the extent such cross-appeal involves rights of Town Court, it is governed by this opinion.
 
 
 3
 Neither party challenges our jurisdiction over these appeals, though each asserts a different jurisdictional basis. Town Court argues that, since no further proceedings remain before the district court, the order of the district court was a "final decision" within the meaning of 28 U.S.C. § 1291 (1970). Defendants, however, assert that the order below was an interlocutory order modifying an injunction within the meaning of 28 U.S.C. § 1292(a)(1) (1970). Though the order of the district court is ambiguously phrased, we believe it properly is to be characterized as an order modifying a preliminary injunction. Jurisdiction in this court is therefore proper under 28 U.S.C. § 1292(a)(1) (1970).
 
 I.
 
 4
 Town Court is a nursing home that provides in-patient care for chronically ill or infirm patients. It has a capacity of 198 patients, and is located in Philadelphia. During the times relevant to this case, the patients at Town Court averaged 75 years of age. Over 90 percent of the patients were poor enough to be eligible to have Pennsylvania's program of medical assistance to the indigent pay for the costs of staying at Town Court.
 
 
 5
 Town Court challenged the procedures by which Secretary Califano and Secretary Beal refused to renew, or otherwise terminated,[1] Town Court's eligibility to be reimbursed in accordance with federal and state medical assistance programs for the cost of caring for indigent patients eligible for assistance under those programs. Specifically, Town Court alleges that it was a violation of its procedural due process rights under the fifth and fourteenth amendments to the Constitution for Secretary Califano and Secretary Beal to end its eligibility without providing it a full evidentiary hearing at the administrative level and for the district court to deny full judicial review Prior to such termination.
 
 
 6
 Central to Town Court's due process argument is its contention that existing administrative procedures governing termination do not adequately protect its interests in continuing participation in the programs at issue. Accordingly, we first examine the statutory and regulatory scheme involved in this case, and then turn to an examination of the events that led to this appeal.
 
 A.
 Statutory and Regulatory Background
 
 7
 This case involves two public medical assistance programs. One is Federal Health Insurance for the Aged and Disabled, commonly called "Medicare," set forth in Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, Et seq. (1970 & Supp. V 1975). In Part A, Medicare provides for hospital insurance benefits for qualified beneficiaries. It is totally federally-funded and administered by the Secretary of Health, Education, and Welfare, though important administrative tasks are performed for the Secretary by designated state agencies.
 
 
 8
 The other program here at issue is Pennsylvania's Medical Assistance Program, commonly called "Medicaid." This program is administered by Pennsylvania's Secretary of Public Welfare, and is set forth at Pa.Stat.Ann. tit. 62, §§ 441.1 Et seq. (Supp. 1978-79) (Purdon). It benefits individuals whose income and other resources fall below prescribed levels by reimbursing providers for a variety of medical services, including in-patient care in a qualified nursing home, rendered beneficiaries. Medicaid is funded jointly by Pennsylvania and the federal government, with the federal government reimbursing Pennsylvania for a certain percentage of the costs of the state program. To be eligible for such reimbursement, Pennsylvania's Medicaid program must comply with the requirements set out in the federal Medicaid statute, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 Et seq. (1970 & Supp. V 1975), and with the regulations promulgated thereunder.
 
 
 9
 Both Medicare and Medicaid are designed to provide assistance to needy persons. Both programs also provide for reimbursement for the type of services provided by in-patient nursing facilities such as Town Court. 42 U.S.C. §§ 1395f, 1395x(j) (Supp. V 1975); Pa.Stat.Ann. tit. 62, § 443.1(3) (Supp. 1978-79) (Purdon). Under the two programs, however, reimbursement is not made to the individual beneficiary. Rather, payment is made directly to the provider of the services as reimbursement for the cost of serving eligible patients. 42 U.S.C. §§ 1395d, 1395f (1970 & Supp. V 1975); Pa.Stat.Ann. tit. 62, § 443.1(3) (Supp. 1978-79) (Purdon).
 
 
 10
 To qualify for reimbursement under Medicare and Medicaid, nursing homes such as Town Court must execute a provider agreement. Under the Medicare program, this agreement is executed between the nursing home and HEW; under Medicaid, it is between the nursing home and the single state agency responsible for the administration of the Medicaid program, which in Pennsylvania is the Department of Public Welfare.
 
 
 11
 Before a provider agreement may be executed, however, the nursing home must be certified as a "skilled nursing facility" under the applicable statutes and regulations, and the facility must maintain its certification throughout the life of the agreement. The Medicare and Medicaid programs are set up so that the determination that a nursing home is a "skilled nursing facility" eligible to participate under the Medicare program also controls whether that facility is eligible to participate in the Medicaid program. 42 U.S.C.A. § 1396i(a)(1) (Supp.1978). Thus any state participating in the Medicaid program as does Pennsylvania must provide in its Medicaid plan that any nursing home receiving payments must satisfy the requirements for a "skilled nursing facility" as established under Medicare. 42 U.S.C. § 1396a(a)(28) (Supp. V 1975). Accordingly, Pennsylvania is required to terminate any Medicaid provider agreement with a nursing home upon notification that HEW has not renewed, or has terminated, that nursing home's Medicare provider agreement. 45 C.F.R. § 249.33(a)(9) (1976).[2]
 
 
 12
 Moreover, Pennsylvania's Medicaid statute independently says that reimbursement may be made only to nursing facilities "qualified to participate under Title XIX of the Federal Social Security Act (Medicaid)." Pa.Stat.Ann. tit. 62, § 443.1(3) (Supp. 1978-79) (Purdon). Thus, under both federal and state statutes, participation in Pennsylvania's Medicaid scheme is contingent upon a facility such as Town Court being certified as a "skilled nursing facility" under federal Medicare provisions.
 
 
 13
 The Secretary of HEW is responsible for determining whether a facility qualifies as a skilled nursing facility. To carry out this certification responsibility, he is required to contract with an appropriate state agency to have that agency survey institutions seeking certification as skilled nursing facilities. 42 U.S.C. § 1395aa(a) (Supp. V 1975). In Pennsylvania, the State Department of Health is responsible for surveying nursing homes to determine if they meet the conditions of participation as set out in the governing statutes and regulations. Any facility participating in the Medicare program must be determined by the Secretary to be in substantial compliance with those governing provisions.
 
 
 14
 Since the law limits the terms of skilled nursing facility provider agreements to twelve months, 42 U.S.C. § 1395cc(a)(1) (Supp. V 1975), surveys to evaluate compliance are conducted at least once a year. Moreover, the Secretary may terminate an agreement with a skilled nursing facility for cause at any time during the life of that agreement if he determines that facility is no longer in compliance with its agreement or with the applicable statutes and regulations, or that it no longer substantially meets the criteria of a skilled nursing facility. 42 U.S.C. § 1395cc(b)(2)(A), (B) (Supp. V 1975). Thus, surveys to determine compliance may occur at any time throughout the year.
 
 
 15
 The Secretary of HEW retains final authority, which he has delegated to subordinate officials, to terminate a provider agreement. 42 U.S.C. § 1395aa(a) (Supp. V 1975). He bases that determination largely on the results of the survey conducted by the state survey agency, since no facility may be certified to participate in Medicare that is not in substantial compliance with the applicable conditions of participation. A decision that an institution does not qualify as a skilled nursing facility means that the institution is precluded from participation until all deficiencies are corrected.
 
 
 16
 The Secretary is required to make findings and set forth pertinent facts and conclusions in connection with an initial decision whether a facility qualifies as a skilled nursing facility, or whether a provider agreement should be terminated. An initial decision to terminate a provider agreement is considered to "be final and binding . . . unless . . . a request for a hearing is filed and a decision rendered," 20 C.F.R. § 405.1504 (1977), or unless the Secretary, upon his own motion, revises his decision within twelve months of the date of issuance in accordance with 20 C.F.R. § 405.1519 (1977).
 
 
 17
 After the initial decision to terminate is made, the Secretary must inform the state agency that administers the state Medicaid program of his disapproval of the facility as a skilled nursing facility. 42 U.S.C.A. § 1396i(a)(2) (Supp. 1978). Since only skilled nursing facilities certified by the Secretary under Medicare are eligible to participate in Medicaid, the state agency then must "take appropriate action to terminate the facility's participation under the (state) plan." 45 C.F.R. § 249.33(a)(9) (1976).
 
 
 18
 An initial decision terminating the facility's eligibility under both Medicare and Medicaid takes effect upon the date specified by the Secretaries. A prescribed period of time must elapse between notice of termination to the facility and to the public and the effective date of termination, though payments may be made for up to thirty days after the effective date for services rendered patients admitted before the effective date. The initial decision to terminate results in a suspension of reimbursement to the facility even though the facility has the right to request further administrative proceedings to review the decision of the Secretary, and ultimately has the opportunity to seek review in the district court.
 
 
 19
 After the initial determination to terminate, the facility may request an evidentiary hearing before an administrative law judge.[3] 20 C.F.R. §§ 405.1530-57 (1977). The decision of the administrative law judge may in turn be reviewed by the Appeals Council, 20 C.F.R. §§ 1558-67 (1977), the last step in the administrative review process. The facility may seek judicial review of the Secretary's termination by filing suit in the district court only after it has exhausted its administrative remedies. 42 U.S.C. §§ 1395ff(c), 1395ii (1970 & Supp. V).
 
 B.
 Factual Background
 
 20
 Town Court first was certified as a skilled nursing facility by the Secretary of HEW in 1967. Though over the next several years surveys revealed various deficiencies, Town Court was able to keep operating continuously through 1973 by submitting plans of correction.
 
 
 21
 In 1974, however, a series of inspections discovered extensive non-compliance with the governing regulations. Town Court obtained several temporary extensions of its provider agreement while it consulted with state officials on ways to correct its deficiencies. Finally, however, on the recommendation of the Pennsylvania Department of Health, the Secretary terminated Town Court effective October 31, 1974.
 
 
 22
 During 1974-75, Town Court periodically applied for re-certification as a provider. The surveys continued to reveal uncorrected deficiencies, however, and no provider agreement was executed. Eventually, in April, 1976, the state survey agency found Town Court to be in substantial compliance with each condition of participation, and recommended to the Secretary of HEW that a new provider agreement be granted Town Court. Accordingly, the Secretary certified Town Court as a skilled nursing facility and entered into a provider agreement for the period from April 14, 1976, through April 30, 1977. This decision by the Secretary apparently activated a Medicaid provider agreement between Town Court and Pennsylvania's Department of Public Welfare entered into on September 4, 1975.
 
 
 23
 Shortly after concluding this new provider agreement, HEW received complaints about the management and level of care at Town Court. These complaints came from a special investigating grand jury empaneled by the district attorney in Philadelphia to study nursing home abuses.[4] Consequently, HEW conducted its own survey of Town Court in July, 1976. When that survey turned up several deficiencies, HEW transmitted the results to Pennsylvania's survey agency and requested that the state conduct another survey.
 
 
 24
 On November 22-24, 1976, a state survey team consisting of three registered nurses, a dietician, and a physician surveyed Town Court. They observed a number of serious deficiencies in both medical and administrative areas. The survey team discussed those deficiencies with Town Court's administrators at an exit interview. And at a meeting held at Town Court's request on December 20, 1976, the survey team discussed the deficiencies in more detail.
 
 
 25
 At the December 20, 1976, meeting, Town Court requested a follow-up survey, and one was conducted on December 30, 1976. That survey resulted in a finding of significant improvement by Town Court. The survey team accordingly recommended that Town Court be allowed to continue as a provider under a Plan of Correction.
 
 
 26
 On March 8-11, 1977, a survey team conducted another survey of Town Court. This team consisted of two registered nurses, a dietician, and an equal opportunity development specialist. The survey was conducted both for Medicare and Medicaid certification purposes, and for state licensing purposes as well. The survey team found severe deficiencies in both administrative and medical areas, and found Town Court to be out of compliance with several conditions of participation.
 
 
 27
 The survey team discussed its findings with Town Court's administrators at the exit interview held March 11, and again at a meeting held March 17, 1977. The Department of Health sent Town Court a written survey of findings on March 31, 1977, accompanied by a Statement of Deficiencies and Plan of Correction. The Plan of Correction was completed by Town Court and returned to the Department of Health on April 14, 1977.
 
 
 28
 The Department of Health sent the November, 1976, and the March, 1977, survey results to HEW on April 21, 1977. It also transmitted the written Statement of Deficiencies and Plan for Correction as completed by Town Court. The state agency recommended that the Secretary not renew the provider agreement due to expire April 30, 1977.
 
 
 29
 Acting upon the recommendation of the Pennsylvania Department of Health, the Secretary decided not to renew Town Court's Medicare provider agreement. The Secretary notified Town Court of this decision by letter dated May 17, 1977. The effective date for termination was set as June 18, 1977. The letter stated that payments for services rendered beyond that date for patients admitted prior to June 18, 1977, would be made for services rendered through July 17, 1977.
 
 
 30
 Secretary Califano notified Secretary Beal of his decision to terminate Town Court's Medicare provider agreement. Secretary Beal in turn notified Town Court by letter dated May 20, 1977, that because of Secretary Califano's decision, Town Court must be terminated from participation in Pennsylvania's Medicaid program, also as of June 18, 1977. In this letter, Secretary Beal offered Town Court a hearing on whether HEW in fact had terminated Town Court's participation in the Medicare program, though Secretary Beal stated that the basis for HEW's action would not be at issue in any such hearing.
 
 
 31
 Town Court requested Secretary Califano to reconsider his decision on May 26, 1977, but requested that the reconsideration process be delayed pending the submission of additional evidence by Town Court. Eventually, on July 14, 21, and 27, 1977, the evidence in support of Town Court's request for reconsideration was received by HEW. The entire Town Court file, including the new submissions, was then sent to the proper HEW officials for an independent reconsideration decision.
 
 
 32
 On July 20, 1977, without having exhausted the available administrative remedies before Secretary Califano had time to rule on Town Court's delayed request for reconsideration but after the July 17, 1977, termination date Town Court brought an action in the district court. Town Court sued Secretary Califano alleging that the "termination" of Town Court's Medicare provider agreement without affording a full evidentiary hearing and allowing for judicial review prior to termination violated Town Court's fifth amendment due process interests. Town Court also sued Secretary Beal, alleging a deprivation of its fourteenth amendment due process interests by Secretary Beal's action in terminating Town Court's participation in the Medicaid program without a prior evidentiary hearing and judicial review.[5]
 
 
 33
 Town Court alleged that it would be irreparably harmed by the actions of defendants and sought injunctive relief. Town Court requested the district court preliminarily and permanently to enjoin the defendants, "prior to a final determination of all appeals by Town Court Nursing Center, Inc.," from: (a) terminating Town Court's Medicare and Medicaid certification; (b) removing eligible patients from Town Court; (c) discontinuing or withholding reimbursement for the care of Medicare and Medicaid patients; and (d) prohibiting future placement of other Medicaid-eligible patients at Town Court.
 
 
 34
 The district court issued a temporary restraining order on July 21, l977, enjoining the defendants from discontinuing or withholding reimbursement for care provided eligible patients, and setting July 26, l977 for a hearing on plaintiffs' motions. Though troubled by the challenge to its subject matter jurisdiction that was raised by defendants, the district court upon the conclusion of the hearing granted the preliminary injunction sought by Town Court. The injunction by its terms was to remain in effect pending completion of the reconsideration process, and until five days after the defendants gave plaintiffs written notice of their intention again to terminate Town Court's provider status.
 
 
 35
 After the HEW officials responsible for reconsidering the initial determination notified Town Court that they had affirmed the initial decision to terminate Town Court's Medicare provider status, Town Court sought an order extending the preliminary injunction pending an evidentiary hearing and full judicial review. A hearing on this motion was held on September 15, 1977, after which the district court denied plaintiffs' motion to extend those parts of the preliminary injunction that enjoined removal of patients and that enjoined defendants from prohibiting the placement of new patients.
 
 II.
 TOWN COURT'S CLAIM AGAINST SECRETARY CALIFANO
 
 36
 Town Court's claim against Secretary Califano states that it was a violation of Town Court's fifth amendment procedural due process rights for the Secretary not to have provided an evidentiary hearing and judicial review Prior to the effective date of Town Court's termination from the Medicare program. In the district court, Town Court alleged that there existed both general federal-question jurisdiction over its claim against Secretary Califano under 28 U.S.C. § 1331 (1970), as well as federal mandamus jurisdiction under 28 U.S.C. § 1361 (1970). In this court, Town Court asserts that jurisdiction in the district court also was proper under 42 U.S.C. § 1395ff(c)(1970) as interpreted in Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), and under 28 U.S.C. § 1491 (1970), the Court of Claims jurisdictional provision.
 
 
 37
 The Secretary believes that jurisdiction over claims of this type is granted to the district courts exclusively under 42 U.S.C. § 1395ff(c) (1970). Since Town Court has not exhausted its administrative remedies as required as a prerequisite to suit under 42 U.S.C. § 1395ff(c) and since Secretary Califano does not believe that the Mathews v. Eldridge, Supra, exception to exhaustion is available to Town Court the Secretary argues that the district court was without jurisdiction to hear Town Court's claim against him.
 
 
 38
 The Medicare statute specifically provides for judicial review in accordance with 42 U.S.C. § 405(g) (1970) of decisions to terminate provider agreements with skilled nursing facilities. 42 U.S.C. § 1395ff(c) (1970). Section 405(g), however, specifies that review is available only upon three conditions: (1) that the action is brought "after any final decision of the Secretary made after a hearing to which (the provider) was a party;" (2) that the action is commenced within 60 days of the mailing of the notice of decision by the Secretary or within such time as the Secretary may allow; and (3) that the suit be brought in the appropriate district court, in general where the provider has its principal place of business.
 
 
 39
 The second and third of § 405(g)'s limitations "specify, respectively, a statute of limitations and appropriate venue. As such, they are waivable by the parties." Weinberger v. Salfi, 422 U.S. 749, 764, 95 S.Ct. 2457, 2466, 45 L.Ed. 522 (1975). Since no claim under these provisions was raised below, we do not consider the applicability of these provisions in this case.
 
 
 40
 The first requirement of § 405(g), that which limits district courts to review of decisions by the Secretary that are "final (and) made after a hearing," has been interpreted "to be central to the requisite grant of subject-matter jurisdiction" under § 405(g). Id. Town Court admits, however, that it has not exhausted its administrative remedies, but rather instituted its action in the district court before any final decision after a hearing was obtained. Accordingly, we must decide whether this case comes within certain exceptions to § 405(g) that would allow the district court to hear Town Court's claim in the absence of exhaustion.
 
 
 41
 In Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Supreme Court characterized § 405(g)'s finality requirement as consisting "of two elements, only one of which is purely 'jurisdictional' in that it cannot be 'waived' by the Secretary in a particular case." Id. at 328, 96 S.Ct. at 899. That nonwaivable, jurisdictional requirement was that "a claim for benefits shall have been presented to the Secretary," Id., a requirement clearly met by Town Court in this case. The requirement of a "final decision . . . after a hearing," however, the Court held was not jurisdictional, but could be waived in certain circumstances.
 
 
 42
 Both Salfi and Eldridge make it clear that "the requirement of a 'final decision' contained in § 405(g) is not precisely analogous to the more classical jurisdictional requirements contained in such sections of Title 28 as 1331 and 1332." Weinberger v. Salfi, Supra, 422 U.S. at 766, 95 S.Ct. at 2467. Since the meaning of "final decision" was left by the Act to the Secretary to define, the Court has interpreted § 405(g)'s finality requirement not as a "jurisdictional" bar affecting a district court's power to adjudicate a given case, but as a policy choice made by Congress that review ought usually to await exhaustion.
 
 
 43
 Salfi and Eldridge both concerned circumstances in which jurisdiction was found in the absence of exhaustion. In Salfi, since the Secretary raised no challenge to the allegations of exhaustion in plaintiffs' complaint, and since the only matter to be resolved was one of constitutional law, the Court based jurisdiction upon a waiver by the Secretary of the finality requirement.
 
 
 44
 In Eldridge, however, the Secretary had not waived the finality requirement. But because the plaintiff had alleged that he was being denied due process by the failure of the Secretary to provide a hearing prior to the termination of his disability benefits, the Court believed plaintiff had a great interest in resolving his claim promptly. The Court accordingly refused to defer to the Secretary's judgment on waiver. Rather, the Court held that because of the nature of Eldridge's claim, the initial denial of benefits constituted a sufficiently "final" decision to allow review under § 405(g):
 
 
 45
 Eldridge's constitutional challenge is entirely collateral to his substantive claim of entitlement. Moreover, there is a crucial distinction between the nature of the constitutional claim asserted here and that raised in Salfi. A claim to a predeprivation hearing as a matter of constitutional right rests on the proposition that full relief cannot be obtained at a postdeprivation hearing. See Regional Rail Reorganization Act Cases, 419 U.S. 102, 156, (95 S.Ct. 335, 42 L.Ed.2d 320) (1974). In light of the Court's prior decisions, see, E. g., Goldberg v. Kelly, 397 U.S. 254 (90 S.Ct. 1011, 25 L.Ed.2d 287) (1970); Fuentes v. Shevin, 407 U.S. 67 (92 S.Ct. 1983, 32 L.Ed.2d 556) (1972), Eldridge has raised at least a colorable claim that because of his physical condition and dependency upon the disability benefits, an erroneous termination would damage him in a way not recompensable through retroactive payments.
 
 
 46
 Mathews v. Eldridge, Supra, 424 U.S. at 330-31, 96 S.Ct. at 901 (footnote omitted).
 
 
 47
 Town Court argues that it comes within the Eldridge Exception to § 405(g). It believes it has stated a constitutional claim that is collateral to its main claim to continue as a provider in the Medicare program. Moreover, Town Court asserts that, in light of the case law on provider agreements, it has stated a colorable claim that because of its dependency upon continued participation in the Medicare program, an erroneous termination prior to a hearing would prejudice it in a way not recompensable after a later hearing and subsequent judicial review by depriving it of benefits without due process. Thus Town Court argues that the existing procedures attending the decision to terminate provider status under the Medicare Act are inadequate to protect its interests.
 
 
 48
 Whether Town Court's claim that it is entitled to an evidentiary hearing and judicial review prior to termination is sufficiently "colorable" to come within the Eldridge exception to the exhaustion requirement of § 405(g) is a close question, and one we need not decide in this case. Town Court has satisfied the non-waivable jurisdictional requirement of § 405(g) in that it has presented its claim to the Secretary. In view of our disposition of Town Court's claim against Secretary Califano, we shall assume without deciding that its due process claim is sufficiently "colorable" to satisfy the waivable non-jurisdictional requirement of a "final decision" contained in § 405(g). We may therefore consider the merits of that claim.[6]
 
 
 49
 We also believe Town Court has the requisite standing to press its due process challenge. It alleges sufficient " ' injury in fact,' that is, a sufficiently concrete interest in the outcome of (its) suit to make (out) a case or controversy subject to a federal court's Art. III jurisdiction." Singleton v. Wulff, 428 U.S. 106, 112, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826 (1976). In addition, we believe Town Court asserts 'an interest arguably within the zone of interests intended to be protected by the constitutional . . . provision on which (it) relies." Id. at 123 n.2, 96 S.Ct. at 2878 (Powell, J., concurring in part and dissenting in part). See Discussion in Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). Of course, we do not decide whether Town Court's asserted interests in fact are protected by the constitutional provision upon which it relies.
 
 
 50
 The Supreme Court in Eldridge considered plaintiff's claim for a pre-deprivation hearing, however, and found the existing procedures there at issue adequate to protect Eldridge's interests. And the Court did so in circumstances very similar to those presented by Town Court's appeal. Eldridge involved a challenge to the scheme by which the Secretary reviewed claims for disability benefits under the Social Security Act. The procedures established under the Act required that a person receiving disability benefits periodically submit information in support of his claim. That information was then reviewed by a medically-trained evaluation team employed by a designated state agency. If the team did not believe the claimant to be entitled to benefits, it so notified the claimant, gave him a summary of its findings, and gave him the opportunity to review his file and submit additional information. If the evaluation team thereafter continued to believe the claimant was not entitled to benefits, it so notified the Secretary. The Secretary then could terminate the disability benefits upon two months' notice. Only after termination did the beneficiary obtain the right to a hearing before an administrative law judge, and to subsequent judicial review.
 
 
 51
 The Court evaluated Eldridge's claim that due process entitled him to a pre-deprivation hearing by analyzing the statutory scheme in light of the various governmental and private interests involved. The Court identified three distinct factors that required consideration in order to identify the specific dictates of due process:First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. See, E. g., Goldberg v. Kelly, Supra, (397 U.S.,) at 263-271(, 90 S.Ct. 1011).
 
 
 52
 Mathews v. Eldrige, Supra, 424 U.S. at 335, 96 S.Ct. at 903.
 
 
 53
 The Court began its analysis by noting that "(o)nly in Goldberg (v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970),) has the Court held that due process requires an evidentiary hearing prior to a temporary deprivation." Mathews v. Eldridge, Supra, 424 U.S. at 340, 96 S.Ct. at 905. The Court distinguished Goldberg, however, as involving persons "on the very margin of subsistence," Id., in contrast to Eldridge to whom the loss of benefits would not present so grievous a loss. Eldridge's eligibility for benefits was unrelated to his financial need, distinguishing his case from Goldberg. Moreover, Eldridge if necessary could have turned to other sources of income, including public assistance, for support. And notwithstanding that the lengthy delays in the administrative appeals process and the modest income of most disabled persons could inflict significant hardships on the beneficiary, the Court held that "(i)n view of (alternative) potential sources of temporary income, there is less reason here than in Goldberg to depart from the ordinary principle, established by our decisions, that something less than an evidentiary hearing is sufficient prior to adverse administrative action." Mathews v. Eldridge, supra, 424 U.S. at 343, 96 S.Ct. at 907.
 
 
 54
 The Supreme Court then focused on the fairness and reliability of the existing pre-deprivation procedures, and on the value of any additional safeguards. It found that the medical decisions that were required were sharply focused and easily documented, turning upon routine, standard, and unbiased reports of trained medical personnel. Credibility and veracity were not important factors in the administrative decision-making process. Moreover, there was little need for an oral hearing since the persons supplying most of the information such as the treating physician were capable of commenting adequately in writing on the forms supplied by the state agency.
 
 
 55
 The Court noted that the policy of allowing the beneficiary to have access to his file guarded against mistake. Further the agency informed the beneficiary of its decision, the supporting reasons, and the relevant evidence. The beneficiary then could submit further evidence in rebuttal.
 
 
 56
 For these reasons, the court distinguished the Eldridge case from Goldberg. It noted that in Goldberg credibility played an important role in the decision-making process. Moreover, the welfare recipients in Goldberg were less likely to be able to communicate in writing effectively, and often lacked the educational skills to make sufficient presentations or to mold their arguments to the needs of the decision-making process. Thus, the court found "(t)he potential value of an evidentiary hearing, or even oral presentation to the decision-maker, is substantially less in (Eldridge ) than in Goldberg." Mathews v. Eldridge, supra, 424 U.S. at 344-45, 96 S.Ct. at 907.
 
 
 57
 In assessing the public interest, the Court emphasized the tremendous financial cost of requiring an evidentiary hearing in all cases prior to termination. Moreover, the Court ruled that the public's interest in conserving fiscal and administrative resources was a factor that weighed against additional procedures. The Court observed that the costs associated with pre-termination hearings would reduce the amounts available to provide benefits for deserving beneficiaries.
 
 
 58
 Finally, the Court emphasized that an evidentiary hearing was not the required, nor even the most effective, method of decision-making in all circumstances. All that due process required was that "the procedures be tailored, in light of the decision to be made, to 'the capacities and circumstances of those who are to be heard,' Goldberg v. Kelly, 397 U.S., at 268-69(, 90 S.Ct. 1011) (footnote omitted), to insure that they are given a meaningful opportunity to present their case." Mathews v. Eldridge, supra, 424 U.S. at 349, 96 S.Ct. at 909. In assessing "when, under our constitutional system, judicial-type procedures must be imposed upon administrative action to assure fairness" the Court stressed that
 
 
 59
 substantial weight must be given to the good-faith judgments of the individuals charged by Congress with the administration of social welfare programs that the procedures they have provided assure fair consideration of the entitlement claims of individuals . . . . This is especially so where, as here, the prescribed procedures not only provide the claimant with an effective process for asserting his claim prior to any administrative action, but also assure a right to an evidentiary hearing, as well as to subsequent judicial review, before the denial of his claim becomes final.
 
 
 60
 Mathews v. Eldridge, supra, 424 U.S. at 349, 96 S.Ct. at 909 (citations omitted).
 
 
 61
 In light of this analysis in Eldridge, we cannot agree that Town Court was entitled to an evidentiary hearing and judicial review prior to the termination of its provider agreement. The procedures established were sufficient to protect whatever interest it had in continued participation in the Medicare and Medicaid programs.
 
 
 62
 Certainly Town Court's private interest in obtaining an evidentiary hearing and judicial review prior to termination is less than was Eldridge's interest in obtaining similar procedural safeguards. Town Court is a corporation claiming financial hardship; Eldridge was a private individual claiming physical disability. Just as Eldridge had alternative sources of income such as welfare Town Court can look to private patients, or to providing other types of care. Town Court's "need" is not the need of "persons on the very margin of subsistence" whom the " 'termination of aid pending resolution of a controversy over eligibility may deprive . . . of the very means by which to live while he waits.' " Mathews v. Eldridge, supra, 424 U.S. at 340, 96 S.Ct. at 905, Quoting Goldberg v. Kelly, supra, 397 U.S. at 264, 90 S.Ct. 1011. As in Eldridge, Town Court's certification as a provider is in no way related to its financial position. Indeed, as the Court of Appeals for the Second Circuit emphasized in finding that a provider was not entitled to a pre-termination evidentiary hearing, nursing homes are not the intended beneficiaries of the Medicare program at all:
 
 
 63
 A nursing facility's "need" for patients has nothing to do with the statutory benefits structure. The facility's need is incidental. That a particular nursing facility cannot survive without Medicaid participation was certainly not Congress' foremost consideration in its creation of the Medicaid program. This is not to derogate Mrs. Case's property interest in her expectation of continued participation. We must, however, place that right in proper perspective with regard to the health and safety expectations of the patients, which expectations the Secretary has a valid interest in protecting. The benefits to a nursing home from its participation in Medicaid reimbursement result from nothing more than a statutory business relationship.
 
 
 64
 Case v. Weinberger, 523 F.2d 602, 607 (2d Cir. 1975).
 
 
 65
 As was true in Eldridge, the decision not to renew a provider agreement is an easily documented, sharply focused decision in which issues of credibility and veracity play little role. It is based in most cases upon routine, standard, unbiased reports by health care professionals. Those professionals evaluate the provider in light of well-defined criteria that were developed in the administrative rule-making process. Written submissions are adequate to allow the provider to present his case. Given the extensive documentation that the provider is able to submit in response to the findings of the survey teams, the provider is unlikely to need an evidentiary hearing in order to present his position more effectively. In any event, there is ample opportunity to expand orally upon written submissions during the exit interview or in discussions during the survey itself. There is opportunity to submit additional evidence after notice of deficiencies is given, and the evidence upon which the recommendation of the survey team is based is disclosed fully to the provider. Moreover, the criteria used to evaluate the provider are well known in advance to the provider, and compliance is readily proved or disproved by written submission. Finally, review by an administrative law judge, by the Appeals Council of HEW, and ultimately by the federal courts, insures that the decision of the Secretary will be thoroughly examined before becoming final.
 
 
 66
 As stated in Eldridge, the public interest in preserving scarce financial and administrative resources is strong. Given the large number of providers participating in Medicare and the frequent surveys that are required, we believe that the costs of providing pre-termination hearings would be substantial. Further, the public has a strong interest in insuring that elderly and infirm nursing home patients are not required to stay in non-complying homes longer than is necessary to assure that the provider had adequate notice and opportunity to respond to charges of deficiencies.
 
 
 67
 In light of the various interests involved, and especially in light of the extensive procedural safeguards already provided to facilities such as Town Court, we believe it clear that any interest Town Court might have in continued certification under the Medicare program is adequately protected by existing procedures. The opinion of the Supreme Court in Mathews v. Eldridge, supra, makes it apparent that due process does not require that Town Court be given an evidentiary hearing and judicial review prior to the effective date of the Secretary's initial decision to terminate provider status under Medicare.
 
 
 68
 We thus believe Eldridge clearly to have foreclosed Town Court's claim that it would be irreparably injured if a pre-termination evidentiary hearing followed by judicial review were not granted by the district court.[7] In this case, therefore, we believe it was error for the district court to have granted Town Court the relief it requested against Secretary Califano.
 
 III.
 TOWN COURT'S CLAIM AGAINST SECRETARY BEAL
 
 69
 Town Court also alleged a cause of action against Commonwealth Secretary Beal. In its complaint, Town Court alleged that Beal's decision to terminate Town Court's Medicaid provider agreement without providing an evidentiary hearing and judicial review prior to termination violated Town Court's fifth and fourteenth amendment due process rights. Town Court alleged both § 1331 and § 1361 jurisdiction.
 
 
 70
 Secretary Beal was represented by counsel at every stage of the district court proceedings. Moreover, he denied in the district court that any constitutional violation had occurred, and moved to dismiss Town Court's action for failure to state a claim and because of lack of subject matter jurisdiction. In this court, however, Secretary Beal expressly has declined to take a position on the legal issues raised on appeal. Nor has he cross-appealed from that portion of the district court's judgment that enjoined him from discontinuing payments to Town Court for care rendered Medicaid patients.
 
 
 71
 Secretary Califano, however, argues that the district court was precluded from hearing Town Court's claim against Secretary Beal. Because his decision to end Town Court's Medicare participation triggered Secretary Beal's obligation to terminate Town Court's Medicaid agreement, Secretary Califano believes that Town Court's claim against Beal is in essence a dispute with Secretary Califano. As such, he argues that the district court was precluded from hearing the claim in the absence of a final decision by the Secretary of HEW rendered after a hearing, as required by § 405(g).
 
 
 72
 Town Court has alleged an independent violation by Secretary Beal of Town Court's due process rights. The complaint alleged that Secretary Beal has an obligation independent of the availability of federal reimbursement to continue Medicaid payments until after an evidentiary hearing and judicial review of the decision to terminate. Town Court sought relief from Secretary Beal without regard for Beal's obligation to comply with federal regulations.
 
 
 73
 Since the action against Secretary Beal thus rests on a basis independent from that supporting the claim against Secretary Califano, we do not believe it is an "action against the United States, the Secretary (of HEW), or any officer or employee thereof" within the meaning of the federal Medicare statute, and as such is not dependent upon that statute for a grant of subject-matter jurisdiction in federal court. 42 U.S.C. § 405(h). Accordingly, we find that the district court had jurisdiction under 28 U.S.C. § 1331 (1970) to hear Town Court's claims against Secretary Beal.
 
 
 74
 As we stated in our discussion of Town Court's claim against Secretary Califano, we believe Town Court has sufficient standing to assert its due process claim. Singleton v. Wulff, 428 U.S. 106, 112, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976).
 
 
 75
 Secretary Beal has chosen not to cross-appeal, unlike Secretary Califano. He apparently so acted in the belief that, since he was required to terminate Town Court's Medicaid agreement upon Secretary Califano's termination of Town Court's Medicare provider status, he is under no independent obligation to provide funding should Secretary Califano not also be obligated to provide reimbursement.
 
 
 76
 We believe Secretary Beal misconceives his position in this litigation. Town Court sued him independently. It alleged a cause of action against him that was not derivative of the cause of action against Secretary Califano, but was based on alleged independent violations of Town Court's constitutional rights to due process. In these circumstances, the judgment of the district court must be seen as binding Secretary Beal to continue Medicaid payments regardless of Secretary Califano's obligation to continue reimbursement.
 
 
 77
 Since Secretary Beal has not cross-appealed, the propriety of the order that the district court entered against him is not before us. This appeal, however, is from a preliminary proceeding in the district court. Upon remand, therefore, Secretary Beal will be free to seek a modification of the district court's order to conform to the judgment of this court with respect to Town Court's rights.
 
 
 78
 We turn now to Town Court's appeal from the district court's refusal to extend parts of the preliminary injunction against Secretary Beal. Secretary Beal's obligation to terminate Town Court's Medicaid provider status arose from two sources: (1) federal Medicaid requirements, incorporated into Pennsylvania's Medicaid agreement with HEW; and (2) the Pennsylvania Medicaid statute itself, that gives beneficiaries the entitlement to have payments made on their behalf only to skilled nursing facilities "qualified to participate under Title XIX of the Federal Social Security Act (Medicaid)." Pa.Stat.Ann. tit. 62, § 443.1(3) (Supp. 1977-78) (Purdon).
 
 
 79
 Secretary Beal's termination of Town Court, therefore, occurred only after the lengthy investigation of Town Court under federal Medicare certification procedures. We believe, as indicated in our discussion in Part II, Supra, that the procedures by which Medicare provider agreement decisions are reviewed provide adequate due process safeguards to providers without the necessity of an evidentiary hearing and judicial review prior to termination. Since Secretary Beal's decision to terminate Town Court was based solely on Secretary Califano's Medicare decision, we believe those procedural safeguards established in the Medicare system are adequate to protect any interest Town Court might possess in its continued participation in the Pennsylvania Medicaid program. Where the state decision, as here, is not based on any independent investigation or evaluation by the state, due process does not demand that additional safeguards beyond those found adequate to review the "controlling" determination be provided.
 
 
 80
 We note in this regard that Town Court was always aware that the results of the Medicare certification survey would determine not only its continued ability to participate in the Medicare program, but also its continued ability to participate in the Medicaid program as well. Moreover, Town Court does not dispute that Secretary Beal offered it a pre-termination hearing on the question of whether HEW indeed had terminated Town Court's Medicare provider status, an offer Town Court declined.
 
 
 81
 In these circumstances, we hold that Secretary Beal was not required to provide an evidentiary hearing and judicial review prior to his termination of Town Court's Medicaid provider agreement.
 
 IV.
 CONCLUSIONS
 
 82
 The order of the district court refusing to extend portions of the preliminary injunction will be affirmed as to Town Court. The order of the district court continuing in effect part of the preliminary injunction will be reversed as to Town Court, and the case will be remanded. Costs taxed against Town Court in No. 77-2221. As to costs in No. 77-2444, see the judgment filed at Nos. 77-2222 and 77-2444.
 
 
 
 [1]
 Town Court characterizes the Secretary's decision in this case as a "termination" of Town Court's eligibility to participate in the medical assistance programs at issue. Secretary Califano, on the other hand, argues that the decision involved in this case is more properly called a determination not to renew an expired eligibility. Since the legal effects of denominating the Secretary's action in one or the other manner are not relevant to this appeal, for the sake of convenience only we will refer throughout this opinion to the Secretary's action as a "termination." See note 3, Infra
 
 
 [2]
 The federal regulations relating to Medicare and Medicaid are being recodified at Chapter IV of Volume 42 of the Code of Federal Regulations. 42 Fed.Reg. 52,827 (Sept. 30, 1977). References herein to these regulations are to the codification in effect when the dispute between HEW and Town Court arose
 
 
 [3]
 After an initial decision that a provider is not eligible to participate in Medicare, and after an initial decision not to renew an expired provider agreement, the provider must request reconsideration by independent decisionmakers within HEW before it may obtain a hearing before an administrative law judge. 20 C.F.R. §§ 405.1504, 1510-18 (1977). A provider may not request reconsideration of an initial decision to terminate an existing agreement during its term, however, but may request a hearing immediately after the initial decision. Id. at § 405.1504. With this exception, there is no difference in the methods of review of initial decisions to terminate and initial decisions not to renew an existing agreement. See note 1, Supra
 
 
 [4]
 On May 11, 1976, the special investigating grand jury returned a presentment concerning conditions at Town Court. That presentment was received into evidence by the district court during the hearings conducted in this case, and Town Court argues that it was prejudiced thereby. Though we doubt the relevance of the presentment to the issues raised by Town Court's complaint in this case, we do not believe any prejudice resulted from the reception of the presentment into evidence
 
 
 [5]
 In the same complaint, six patients at Town Court, acting individually and on behalf of the purported class of Town Court patients eligible under Pennsylvania's Medicaid program, sued Secretary Beal. The patients alleged that Secretary Beal's termination of Town Court's Medicaid provider status caused them to suffer a loss in Medicaid benefits without a prior evidentiary hearing and without judicial review, in violation of 45 C.F.R. § 245.10 (1976), and in violation of the patients' fifth and fourteenth amendment rights to due process. This issue is the subject of separate appeals. See Town Court Nursing Center, Inc. v. Beal et al., etc., Emma Cooper, et al., appellants, No. 77-2222, and Town Court Nursing Center, Inc. v. Beal et al., etc., Califano, etc., appellant, No. 77-2444, 586 F.2d 280
 
 
 [6]
 In light of our approach to the question of jurisdiction in this case, we do not consider Town Court's contention that jurisdiction is proper under 28 U.S.C. § 1331, § 1361, or § 1491 (1970)
 
 
 [7]
 Town Court argues that, Eldridge notwithstanding, the decisions in Hathaway v. Mathews, 546 F.2d 227 (7th Cir. 1976), and Klein v. Mathews, 430 F.Supp. 1005 (D.N.J.1977), Remanded with instructions to dismiss as moot, 586 F.2d 250 (3d Cir. 1978), support its thesis that due process requires an evidentiary hearing and judicial review prior to termination
 Hathaway Is distinguishable: Not only did the court there manage to discuss procedural due process without mentioning the decision in Eldridge, Hathaway presented a case where no due process whatsoever was provided the nursing home prior to termination. The reasons for termination were not made known to the provider, and no opportunity to submit evidence was given. Hathaway v. Mathews, supra, 546 F.2d at 231-32. See Case v. Weinberger, 523 F.2d 602, 606-09 (2d Cir. 1975).
 Klein is not relevant to Town Court's appeal: it involved the due process rights of patients only, not those of providers under the act.