**ROCKHILL CARE CENTER, INC., a Missouri corporation, Plaintiff,**

v.

**Patricia Roberts HARRIS, Secretary of the Department of Health and Human Services; Eugene Hyde, Regional Administrator of the Health Care Financing Administration, Region VII; and State of Missouri, Department of Social Services, David Freeman, Director; State of Missouri, Division of Aging, Diane Felix, Acting Director; State of Missouri, Division of Family Services, James R. Moody, Director; David Freeman, Director, Department of Social Services; Diane Felix, Acting Director, Division of Aging; and James R. Moody, Director, Division of Family Services, Defendants.**

No. 80–0985–CV–W–6.

United States District Court,
W. D. Missouri, W. D.

Dec. 1, 1980.

---

**6.** Since the court holds that the warrant is a general warrant, the severance doctrine is inapplicable.

Kelly L. McClelland and R. Frederick Walters, Linde, Thomson, Fairchild, Langworthy & Kohn, Kansas City, Mo., for plaintiff.

Mark J. Zimmermann, Asst. U. S. Atty., Robert Van Norman, Dept. of Health & Human Services, Kansas City, Mo., D. B. Kammerer, General Counsel, Dept. of Social Services, Jefferson City, Mo., for defendants.

## MEMORANDUM OPINION GRANTING PRELIMINARY INJUNCTION AGAINST TERMINATION OF MEDICAID FUNDING

SACHS, District Judge.

### I. Background

This litigation was brought by Rockhill Care Center, Inc., a nursing home in Kansas City, Missouri, seeking to enjoin state and federal authorities from taking actions terminating medicaid funding. Rockhill's six-month medicaid provider contract with the state medicaid agency (Division of Family Services) was terminated by nonrenewal on September 30, 1980. Termination was based on a periodic pre-renewal survey of the facility in July, 1980 by the state Division of Aging, following which the state gave notice of nonrenewal and the federal agency (Health Care Financing Administration) gave concurrent notice of rejection of a pending application for medicare authorization. A requested resurvey in September, conducted with federal participation, resulted in confirmation of the nonrenewal decision. Rockhill's request for a 60-day extension of the medicaid agreement, as authorized by regulation, was rejected by the state after consultation with the federal agency; at such consultation the responsible federal official, Edward Brennan, made it clear that the federal decision was controlling, in that the state could not grant an extension during a period when a medicare application had been rejected.

Regulations provide for a 30-day continuation of funding after termination of a medicaid contract. The period is granted a provider to settle its affairs and to give medicaid patients in the facility an opportunity to make an orderly relocation. Rockhill was financially unable to take "no" for an answer. The joint state-federal decision, if carried out, would be fatal to continued operations of the facility. Medicaid accounts for approximately $140,000 of Rockhill's monthly income of $200,000; the bulk of its remaining income is medicaid-dependent in that its source is Social Security payments to medicaid patients. Even with such financing, Rockhill has been struggling to make ends meet—its monthly expenses approximate $215,000. In July, 1980, there were about 150 medicaid financed residents at the facility and only about five "private" residents. While a transition to private financing is logically conceivable, maintenance of services during the interim between the mass departure of medicaid patients and the arrival of privately financed patients would require operational and financial sleight-of-hand which Rockhill denies, with credibility, that it could manage. Ownership of the facility is held by a corporation whose principal stockholders are three dentists, an attorney employed by the government, and an airline pilot.

Treating the August 28, 1980 denial of contract renewal, the simultaneous denial of the medicare application, and the September denial of a 60-day extension as a combination of potentially fatal wounds, Rockhill has been fighting back on all fronts. Appeals for federal reconsideration and state hearings have been duly filed, an effort was made through state administrative channels to stay the termination of funding (which was denied because of the controlling role of the federal medicare status), and state court proceedings were instituted to enjoin the termination of funding. State Circuit Judge Paul E. Vardeman granted a temporary restraining order immediately prior to expiration of the 30-day

"grace period." There has thus been no termination of funding, which comes initially from the state, although federal officials contend they cannot give effect to the state court decision in which they did not participate; reimbursement of the state for the federal share of the funding has become the subject of a cross-claim in this case.

Recognizing that relief might not be adequate without joinder of federal defendants, or believing the state court litigation might be defective as to venue, Rockhill filed this suit November 7, 1980, against state and federal defendants, seeking continuation of medicaid payments and relief pertinent thereto. Rockhill's basic legal theory is that a pretermination evidentiary hearing before an independent body is mandated by the due process clauses of the fifth and fourteenth amendments to the Constitution. Additional claims, not yet sufficiently articulated for adequate review, apparently assert violations of statutes and regulations.

The interests of medicaid-assisted residents are central to the equitable disposition of this litigation. Rockhill has not neglected to rally appropriate support from such residents and to base its most appealing arguments on their plight. The president of the residents' council, Robert Obermeyer, has joined as a plaintiff in this litigation and testified at the hearing on the preliminary injunction. A special procedural point made by the residents is that the state gave them notice of a right to appeal, and represented that there would be a continuation of their benefits during appeal, but thereafter purported to retract the rights so given. The showing to the Court leaves the inference that substantially all of the medicaid-assisted residents, reduced to approximately 116 in number by reason of the uncertainties posed by the pending controversy, are substantially satisfied with the services they are receiving or at least do not expect better service elsewhere. Most if not all of them apparently prefer the location of Rockhill, which is convenient to their former homes and provides relatively ready access for those friends and families who visit them. Three other medicaid cer-

tified providers are within the five mile radius, but are presently closed to further medicaid residents. Hearsay testimony offered by both sides is conflicting as to the extent of availability of additional medicaid beds in Jackson County, the home county of the residents. The state contends that 68 beds are available in the outlying communities of Lee's Summit and Blue Springs, many miles from Rockhill. If these beds were filled from Rockhill, approximately 50 medicaid patients would still be homeless. The state suggests that residents might possibly be scattered through northwestern Missouri, in the limited facilities said to exist. The resulting isolation from friends and families would be a significant deprivation. Even if this were feasible, closure of Rockhill would apparently create a crisis of short supply of medicaid facilities in the 75-mile area contiguous to Kansas City. Some concern should be felt for other residents of the area who may need medicaid facilities, now or in the near future.

II. Procedural Status-Fact Evaluation

After a conference with counsel, the Court entered a temporary restraining order on November 13, 1980 (and a clarifying amendment on November 14, 1980), requiring continuation of medicaid funding. The need for such an order was indicated by the probable insufficiency of Judge Vardeman's order to reach federal matching funds and the likelihood that the state court litigation would be voluntarily dismissed. The Court is now advised that related litigation has been filed in Circuit Court in Cole County, Missouri, as a possible backup in the event this case fails to achieve Rockhill's purposes, but the state litigation is not being processed. Counsel for defendants asked for scheduling of a hearing at the earliest available time, November 24, 1980, on which date the Court orally extended the restraining order to expire December 3, 1980. The purpose of the extension was to allow time to hear evidence and make as deliberate a ruling as possible on the request for a preliminary injunction.

Evidence was heard on November 24, 25 and 26, 1980. The Court heard Rockhill witnesses as follows: Richard C. Snook, acting administrator of Rockhill; Barbara Hill, a social worker (who testified about "transfer trauma"); Robert Obermeyer, president of the residents' council; June Shelp (a state employee who testified about the hearing notices to residents and retraction thereof); Darla Montgomery, Rockhill's new director of nursing; and Dr. Alfred Gilgore, who has served for some years as house physician. State agency witnesses included two who testified concerning available medicaid beds and why the state retracted its hearing offer to residents; nurse Elizabeth Russell, a member of the survey teams; Diane Felix, Acting Director, Division of Aging, whose principal testimony related to the federal government's role; and Dr. Raymond Claxton, who had made a current visit to Rockhill to gain knowledge of its medical performance. William R. Blake, the only federal witness, outlined statutory and regulatory procedures for medicare and medicaid, but disclaimed any personal role in evaluating or supervising the evaluation of nursing home performance.

The federal defendants assert, in the alternative, that (1) federal law sets standards and provides funding for those who meet the standards, but the present controversy is wholly between the state and its provider; and (2) the federal agency is allegedly playing a central role in "attempting to impose and enforce minimum standards of care on Rockhill." As will be shown, there is reason to believe that federal authorities are indirectly exerting pressure on Rockhill, but the remoteness of the relationship seems to have inhibited meaningful and productive attempts to find solutions. It is to be hoped that once the parties conclude they must live with each other, a successful accommodation will be hammered out.

Much of the testimony has been set forth above. The parties refrained from an indepth review of the content of the survey criticisms; at least a general understanding of the ultimate issues is material, however,

under some of the case law to be discussed. The July survey made a one-time criticism of social services; this was disputed and was not included in the September criticisms of Rockhill. Nursing services were listed as a deficiency in July; specifically, the team was not satisfied with catheter care, measurement of patient input and output, and documentation. Testimony tended to show some acquiescence by Rockhill in these criticisms, and efforts to correct the same. There was no evidence that the deficiencies had a material injurious effect on the patients. No special incidence of illnesses related to catheters was shown, for example; there was no claim that mortality at Rockhill was unusually high, as compared with comparable medicaid providers. Without forming conclusions binding after further evidence, the Court's impression from the Snook, Obermeyer, and Gilgore testimony, taken with the Russell testimony, is that nursing services in July were slightly but not alarmingly substandard for a medicaid-certified institution. Missouri's nursing home licensing standards have apparently been satisfied and are not in question. Nursing services appear to be Rockhill's most serious continuing problem.

Additional deficiencies in conditions were listed in the September survey. It appears to be Rockhill's contention that this survey, made after the adverse medicare decision which must be followed by the state, was influenced by the federal complication and was conducted in a hypercritical manner. Details of deficiencies and the seriousness of deficiencies were not developed by the defendants. Ms. Russell did testify that nursing services improved between July and September.

Current conditions came through as being reasonably good, considering the morale problems posed by a threatened cut-off of federal and state funds. Ms. Montgomery, director of nursing as of early November, was a rather impressive witness, not impeached during cross examination. She testified to various changes she had made during her brief service. Dr. Claxton, the state agency witness, confirmed the Court's

favorable impression of Ms. Montgomery, although he noted somewhat irrationally that his opinion of her was lower after he learned that she had been employed at a facility in Joplin which apparently did not have his approval; he also tended to question her credibility about a conversation that had occurred. Dr. Claxton found there was no abuse or neglect of patients and no jeopardy to their health or safety. He questioned whether Rockhill would yet be able to achieve the necessary passing score on the eighteen conditions for medicaid certification. The only deficiency mentioned was a dirty kitchen. There was no suggestion in the evidence that diet-related illnesses were or are unusually prevalent at Rockhill, so as to imply a serious or continuing problem.

With respect to patient observations, a factor emphasized in a recent Supreme Court decision, Mr. Obermeyer, a thoroughly credible witness, testified in praise of the facility, and compared his situation favorably with his experience at Swope Ridge, a well-known local facility with medicaid certification. Dr. Gilgore, who also had experience at other facilities, testified favorably about patient care at Rockhill. Discounting the testimony for possible bias, there is little basis for the Court to consider that Rockhill is not presently suitable for medicaid patients, or that the environment there would not be superior in balance to the situation they would face if forced to leave the facility. On the contrary, it seems almost imperative that Rockhill remain available for medicaid care, based on the testimony of area needs presented to the Court.

The balance of equities in this case, as between Rockhill and the defendants, is weighted almost entirely in favor of Rockhill. Considering the public interest as an element, continuous medicaid funding appears to be essential for the patients, and the institution. If a few medicaid patients were involved, who could be readily transferred, and if Rockhill were less dependent on massive federal-state funding, a different balance might be struck. If there were life-threatening conditions at Rockhill, the balance would of course shift.

Unlike most "welfare" controversies, governmental fiscal considerations do not weigh in the balance here. The patients are all entitled to medicaid funding. Any short-term failure to fund would be an undeserved windfall to the governmental units at the expense of aged, infirm and impoverished persons and an institution which is meeting a significant public need. Insofar as the issue is simply the timing of an evidentiary hearing on Rockhill's qualifications for medicare and medicaid, it would seem that such hearings should be conducted as soon as possible, rather than after Rockhill has closed its doors, dispersed its residents and terminated its staff. There is no showing that quasi-judicial hearing officers in either the state or federal governments have higher priority duties which would justify deferring a hearing in Rockhill's case.

■ Perhaps the only policy consideration favoring the agencies is the possible loss of credibility of their decertification procedures. Decertification is presented to the Court as the sole means available for maintaining standards. In a situation where there was less dependence on medicaid funding, and more credible alternatives for residents, the Court might be impressed by this argument. In the present context, however, defendants are asking the Court to stand aside while they "throw the baby out with the bathwater." Judicial notice will be taken, moreover, of the considerable costs imposed on Rockhill by the present combat, and the loss of residents and funding attributable to uncertainty. Rockhill is thus feeling a strong coercive impetus for satisfying the state and federal demands, right or wrong. The Court concludes that the agencies retain an adequate whip.[1]

---

1. As noted orally, this case points up a need for legislation or regulations authorizing sanctions less drastic than a total termination of funding.

Fines and even brief terms of imprisonment for nursing home officials who fail to maintain proper standards should doubtless be authoriz-

### III. Legal Issues and Conclusions

While the outcome of this proceeding may seem foreordained by the above factual and policy considerations, federal courts cannot hold themselves out as knights-errant, always available to prevent distressing events. *People v. Galamison*, 342 F.2d 255, 273–4 (2d Cir. 1965, concurring opinion). Even though the balance of hardships apparently demands redress, judicial authority to enter preliminary injunctions is confined to situations where legal remedies are inadequate and a plaintiff has a legal contention of at least sufficient plausibility to make it a "fair ground for litigation." *Rittmiller v. Blex Oil, Inc.*, 624 F.2d 857, 869 (8th Cir. 1980); *Fennell v. Butler*, 570 F.2d 263 (8th Cir. 1978).

■ The Court has orally expressed serious misgivings about the plausibility of plaintiff Rockhill's legal contentions, in light of the unanimous ruling by the judges of the Third Circuit, en banc, that a nursing home operator has no constitutional right to a pretermination hearing, when faced with medicaid termination or nonrenewal. *Town Court Nursing Center, Inc. v. Beal*, 586 F.2d 266 (3rd Cir. 1978). The *Town Court* ruling in this respect, while not appealed, was noted with apparent favor in the Supreme Court's decision earlier this year which held that medicaid patients do not have standing to challenge decertification of their nursing home, but must rely on the home to represent their interests. *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980).[2] Justice Stevens' majority opinion in *O'Bannon* recites with an air of approval the ruling below that "Town Court's property interests were sufficiently protected by informal pretermination procedures and by the op-

portunity for an administrative hearing and federal court review after benefits had been terminated." Note 6, 100 S.Ct. at 2471–2.

Closer study of *Town Court* and *O'Bannon*, together with other nursing home medicaid cases, causes the Court to conclude, however, that Rockhill retains plausible arguments based on some factual distinctions and the vulnerability of the assumptions made in the *Town Court* opinion. As Justice Blackmun noted in *O'Bannon*, bad law is a high hazard in preliminary injunction proceedings, where orders must be entered on a "limited development of the record" and insufficiently "focused presentation of legal arguments." Concurring opinion, note 10, 100 S.Ct. at 2484.[3]

Except for *Town Court*, the case law on pretermination hearing rights in nursing home medicaid cases has seemed to fall into two classifications: (1) where significant safety conditions were at issue, emergency terminations of benefits would be sanctioned, with full evidentiary hearings deferred (*Case v. Weinberger*, 523 F.2d 602 (2d Cir. 1975); *Green v. Cashman*, 605 F.2d 945 (6th Cir. 1979); *Caton Ridge Nursing Home, Inc. v. Califano*, 596 F.2d 608 (4th Cir. 1979)); (2) where less pressing health and safety conditions were in question, a pretermination evidentiary hearing before an independent hearing officer would be required (*Hathaway v. Mathews*, 546 F.2d 227 (7th Cir. 1976); *Ross v. State of Wisconsin Department of Health and Social Services*, 369 F.Supp. 570 (E.D.Wis.1973—three judge court)).[4]

*Town Court* announced much more limited due process requirements, based on factual assumptions made by the court and its

---

ed as an alternative to an institutional death sentence.

**2.** It seems probable that plaintiff Obermeyer has no standing under *O'Bannon*, or that his claim is against the state agencies.

**3.** With necessary consistency the Court should concede that its opinion here may be flawed by factual and legal blunders which would be less likely in a more deliberate proceeding.

**4.** In other litigation, the Department of Health, Education and Welfare (now Health and Human Services) apparently accepted the rule that pretermination hearings should occur unless "an emergency situation exists." *Bracco v. Lackner*, 462 F.Supp. 436, 454 (N.D.Cal. 1978). *Bracco* was litigation brought by nursing home patients, but there is little doubt that *Hathaway* was accepted by the court as a sound decision.

reading of the Supreme Court's diminution of due process requirements in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). *Eldridge* decided that "prior to the termination of Social Security disability benefit payments the recipient (need not) be afforded an opportunity for an evidentiary hearing." l.c. 323, 96 S.Ct. l.c. 897.

The rationale in *Eldridge* is clearly not controlling here, in that it was dependent on (1) the clogging of the administrative process which a contrary holding would entail and (2) the financial losses to the government if disability benefit recipients could retain entitlement until the completion of evidentiary adjudication of their ineligibility. In the present case, no such governmental financial losses are threatened, and it is not claimed that medicaid providers are so numerous and so frequently decertified as to impose gross administrative problems if a pretermination hearing were required.

The Court in *Eldridge* distinguished *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), which held that the above factors were overcome, in the case of welfare recipients, because (1) their dire need increased the harshness of pre-hearing terminations and (2) there was a greater need to hear welfare case testimony, because the issues were supposedly less "sharply focused and easily documented" than in disability cases. 424 U.S. at 340–7, 96 S.Ct. at 9u5–909.

It may be argued that the massive dislocation resulting from closing a nursing home more nearly resembles the *Goldberg* than the *Eldridge* deprivation. The evidence in this case, so far as the Court can now determine, also suggests that the possibility of error in the absence of a hearing is more nearly likened to *Goldberg* than to *Eldridge*.

The Court's last observation is contrary to the stated assumptions of *Town Court*, but is based on what this Court has heard in two days of testimony. The decision not to renew this provider agreement was not "an easily documented, sharply focused decision in which issues of credibility and veracity play little role." *O'Bannon*, supra, 100 S.Ct. at 2472, n. 6, quoting *Town Court*, supra at 277–78. The Court has reason to question that it is faced with "routine, standard, unbiased reports by health care professionals (working from) well-defined criteria..." Rockhill contends, and the Court finds some plausibility in the contention, that the survey conclusions were quite subjective in nature, that the weight placed on various deficiencies was not easily definable nor clearly reasonable, and that in at least the closing stages of the scenario impatience and annoyance may well have become factors. While Rockhill representatives may have been somewhat blameworthy in creating a contentious and biased atmosphere, slippage from strict administrative neutrality would cause serious due process problems.

The defendants' testimony concerning the condition of patient care at Rockhill came from witnesses Russell (a nurse who participated in three surveys) and Dr. Claxton (who visited the facility this month). Ms. Russell referred to "very unpleasant" exchanges during the exit interview in September. She did not consider the patients to be in any imminent danger, but did categorize the quality of health care as "not good." She reported improvements in nursing service between July and September. This puts in question the rational basis for federal agency refusal to concur in a two-month extension before taking action which would close Rockhill. Federal regulations authorize such extensions where there is written confirmation that the extension will not jeopardize the patients' health and safety and is needed to prevent irreparable harm to the facility or hardship to the recipients. 42 C.F.R. § 442.16. It seems probable that these conditions could have been satisfied. The more likely explanation for the adverse action is that federal officials had lost patience with Rockhill.

Ms. Russell's experience has apparently been exclusively outside the large metropolitan areas. She has participated in medicaid evaluations of only four nursing homes.

Rockhill in Kansas City and a nursing home in St. Louis were both ruled out of compliance. While speculative at this time, an issue may be developed as to whether the survey team's evaluation of nursing homes faced up to urban problems.[5]

Dr. Claxton's testimony was not pertinent to the surveys as such, but he did increase the Court's respect for Rockhill's contention that subjective, impressionistic evaluations have (perhaps necessarily) played a role in measuring patient care. Under the *Goldberg-Eldridge* dichotomy, this means they should be tested in pretermination evidentiary hearings rather than accepted on paper presentations. If experience shows this to be too cumbersome, the Court's suggestion in note 1 may prove to be feasible.

One additional area of vulnerability in the procedures followed may be noted. Although *O'Bannon* was decided by the Supreme Court in June, it is not clear that the survey teams in July or September, or the state and federal officials even today, are giving "important, or even critical" effect to patient input in evaluating nursing homes. See 100 S.Ct. at 2474, note 15.

It is concluded that Rockhill's claim to a pretermination evidentiary hearing as a matter of constitutional law presents a "fair ground for litigation" despite the *Town Court* decision.[6]

## IV. Federal Defendants

A preliminary injunction should issue, for the reasons set forth above. Whether it should run to the federal defendants is the remaining consideration. The testimony of Ms. Felix, the discussion showing the significance of the medicare decision by federal officials, the federal involvement in the September survey, and the statement in the federal defendants' brief which implies that federal officials are engaged in pressuring Rockhill to meet certain standards all point toward holding the federal defendants in the case.

The Court assumes that a denial of a medicare application, in the abstract, can properly be made without a prior evidentiary hearing. The same might normally be said of a decision to let a contract terminate in accordance with its own provisions. In *Town Court*, however, the Court recognized that the practical effect of a nonrenewal and a termination were the same. Note 1, 586 F.2d at 268. By the same reasoning, when a denial of a medicare application has a triggering effect which terminates medicaid funding, with the potentially damaging effect here in evidence, timely hearing rights mandated by due process would seem to be required in federal as well as state proceedings.

While the federal defendants assert they do not earmark funds for a particular medicaid facility, they apparently reimburse the state agencies for portions of authorized expenditures. Under state law, a failure to provide matching funds would be an excuse for termination of state aid. This may be an additional reason for retaining jurisdiction over the federal defendants, to assure uninterrupted funding.

For the foregoing reasons, a preliminary injunction should issue as to all parties defendant.[7]

---

5. The Court does not imply that substandard conditions should be tolerated at urban nursing homes but considers it possible that survey teams may be misled by experience in better nursing homes in a rural or small town setting.

6. The Court stated at the hearing, and now reiterates, that *Town Court*'s massing of judges may be deceptive, in that a majority concluded that the residents themselves had a right to a pretermination evidentiary hearing. This conclusion, now reversed in *O'Bannon*, may have made it easier to go along with the denial of rights to the nursing home itself.

7. The financial and practical consequences of this order are of sufficient importance so that the Court should note what may be implicit in all such orders: the order entered is subject to modification or vacation on a showing of changed conditions; the Court will also consider any proposed equitable conditions on the granting of the relief. As a last resort, a receivership may be considered, preferably under state court supervision. *Bracco v. Lackner*, 462 F.Supp. 436, 455–6 (N.D.Cal.1978).

It is therefore ORDERED that, subject to the further orders of the Court, the defendants provide to and for the use of plaintiff Rockhill Care Center, Inc., federal and state funds for the medicaid benefits of those residents of the Rockhill Care Center facility who have individual eligibility for medicaid assistance.

This order shall be and is effective December 1, 1980, without execution and filing by plaintiff of an injunction bond, in that the Court finds that no losses will occur to defendants by reason of this order, since plaintiff is performing and will perform services for the funds so received.