654 F.2d 1234
 NORTHLAKE COMMUNITY HOSPITAL, Plaintiff-Appellant,
v.
The UNITED STATES of America, The Department of Health and
Human Services and Richard S. Schweiker,
* Secretary of the Department
of Health and Human Services,
Defendants-Appellees.
 No. 80-2268.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 9, 1980.
Decided July 21, 1981.
Rehearing Denied Sept. 29, 1981.
 
 Stephen H. Pugh, Jr., Chicago, Ill., for plaintiff-appellant.
 Robert B. Breisblatt, U.S. Atty., Frederick H. Branding, Asst. U.S. Atty., Chief, Civ. Div., Chicago, Ill., for United States, defendant-appellee.
 Before BAUER and CUDAHY, Circuit Judges, and BARTELS, Senior District Judge.**
 CUDAHY, Circuit Judge.
 
 
 1
 Plaintiff-appellant, Northlake Community Hospital ("Northlake"), appeals from the district court's dismissal of its suit for injunctive relief against the United States of America, the Department of Health and Human Services ("DHHS") and Richard S. Schweiker, Secretary of Health and Human Services (the "Secretary").[1] Northlake's complaint, filed on August 6, 1980, claimed that the Federal Defendants violated the hospital's right to due process by failing to conduct a hearing prior to the termination of Northlake's Medicare provider agreement. On August 20, 1980, the district court dismissed the complaint with prejudice on the grounds that Northlake failed to establish subject matter jurisdiction and failed to state a claim upon which relief could be granted. Northlake seeks review of both the district court's final judgment dismissing its complaint and a subsequent order denying reconsideration of the dismissal. We affirm.
 
 I.
 
 2
 Title XVIII of the Social Security Act, 42 U.S.C. § 1395 (1979), sets forth the statutory requirements for participation in the federally funded Medicare program. This program, administered by the Department of Health and Human Services (formerly the Department of Health, Education and Welfare) provides health insurance benefits for aged and disabled persons by making payments directly to the institution or individual providing the health service or care (rather than to the individual beneficiary). 42 U.S.C. § 1395c and f (1979). In order to receive payment for services rendered to a Medicare patient, an institution must meet the conditions of participation prescribed by the Social Security Act and accompanying regulations. See 42 U.S.C. § 1395 (1979) and 42 CFR § 405.1011 et seq. (1980). The institution then becomes eligible to execute a one year renewable provider agreement with the government. 42 U.S.C. § 1395cc (1979). Institutions certified as Medicare providers are subject to periodic surveys by state agencies designated by the Secretary to evaluate compliance with federal standards. 42 U.S.C. § 1395aa (1979) and 42 CFR § 405.1904 (1980). If the institution fails to maintain compliance with the prescribed conditions of participation, the Secretary has the authority to terminate the institution's provider agreement at any time. 42 U.S.C. § 1395cc(b)(2) (1979) and 42 CFR § 489.53(a)(3) (1980).
 
 
 3
 Northlake, the plaintiff-appellant here, is a full-service 115 bed hospital, which has been certified as a Medicare provider since the program's inception in 1967. The hospital, which employs a staff of 350 doctors, nurses and support personnel, receives more than $2,000,000 a year from the federal government in payment for Medicare services. This payment represents approximately 20% of the hospital's total yearly revenue.
 
 
 4
 In late November 1979, the hospital administrator received written notice that the Federal Defendants were initiating action to terminate Northlake's Medicare provider agreement because the hospital no longer qualified for participation in the program. Included in the letter of notification was a list of deficiencies found by inspectors from the Illinois Department of Public Health during post-certification visits to Northlake in July, August and September 1979. According to the state survey, Northlake failed to comply with four conditions of participation: Physical Environment, 42 CFR § 405.1022 (1980); Medical Staff, 42 CFR 405.1023 (1980); Dietary Department, 42 CFR § 405.1025 (1980); and Laboratories, 42 CFR 405.1028 (1980). The most serious deficiencies cited by the inspectors involved violations of the National Fire Protection Association's Life Safety Code, which is incorporated in the Medicare Physical Environment condition. See 42 CFR § 405.1022B (1980). The letter urged Northlake to contact the Federal Defendants if the hospital had taken steps to correct the deficiencies or had definite plans for doing so, but warned that, absent compliance, notice of a termination date was imminent.
 
 
 5
 Six months passed before Northlake responded to the Federal Defendants' notice of deficiencies. On June 1, 1980, the hospital administrator informed the DHHS Regional Health Standard Quality Office that "substantial progress (had) been made toward compliance." Although the administrator explained that Northlake had corrected or eliminated most of the deficiencies, two major Life Safety Code violations remained. First, the hospital failed to provide "at least two exits (on each floor or fire section) which are remote from each other and one of which is a door leading directly outside the building or to an interior stairway leading outside the building." Defendants' Br., App. C. Second, "every aisle, passageway, corridor exit discharge, exit location and access (did) not have a readily available egress leading to an exit." Id. In response to the first deficiency, the administrator could only report that plans for an additional stairway from the fourth floor to the first floor had been submitted to the state "some time back" and would be "completed as soon as funds (were) available." Correction of the second deficiency, however, required such extensive and costly repair that the administrator requested a waiver of this condition because "the safety benefit to be derived (did) not justify the cost."
 
 
 6
 After reviewing the hospital administrator's response and the results of an additional survey conducted in January 1980, the Federal Defendants notified Northlake on July 18, 1980, that its Medicare provider agreement would be terminated effective August 8, 1980, due to "the existence of serious deficiencies which limit the capacity of your facility to render care without hazard to the health and safety of your patients." The letter of termination explained that the Life Safety Code violations found in both the July-September 1979 and January 1980 surveys formed the basis for the Federal Defendants' decision. Since several of the deficiencies found during the January 1980 survey had not previously been reported to the hospital, a list of these deficiencies was attached to the letter. The Federal Defendants also informed Northlake that it could challenge the decision by submitting a written request for a hearing within 60 days of the notice of termination.
 
 
 7
 The hospital administrator immediately demanded that the Federal Defendants rescind the termination order. While readily admitting that certain Life Safety Code violations had not been corrected, the administrator argued that "none of the deficiencies cited have a bearing on the quality of care provided to patients in our hospital, nor is the safety of our patients in jeopardy." He suggested that the Federal Defendants meet with Northlake administrators to formulate a mutually agreeable plan for correcting the deficiencies. In the event that the Federal Defendants chose not to rescind the order, the administrator also made a separate request for a prompt hearing on the matter.
 
 
 8
 When no hearing was scheduled prior to the August 8 termination date, the hospital filed suit for injunctive relief. In a verified complaint dated August 6, 1980, Northlake charged that the Federal Defendants had violated the hospital's constitutional rights by failing to conduct a hearing prior to the termination of Northlake's Medicare provider agreement. The hospital claimed that the court had jurisdiction pursuant to 28 U.S.C. § 1331(a) (1976).[2] Shortly thereafter, the Federal Defendants filed a motion to dismiss the action on the grounds that federal jurisdiction was precluded by 42 U.S.C. § 405(h) (1976).[3] See Weinberger v. Salfi, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). In addition, the Federal Defendants argued that Northlake was not entitled to a hearing prior to the termination of its provider agreement and that Northlake had failed to exhaust the administrative remedies available to it.
 
 
 9
 The district court heard argument on the jurisdictional issue at a hearing on August 15, 1980. During these arguments, Northlake maintained that the court had jurisdiction over its constitutional claims pursuant to 42 U.S.C. § 405(g) (1976)[4] even though the complaint stated that the court's jurisdiction was based on 28 U.S.C. § 1331(a) (1976). Moreover, Northlake admitted that the hospital was not entitled to a full evidentiary hearing prior to the termination of its provider agreement, but insisted that the Federal Defendants were required to provide preliminary pre-termination procedures which conformed with due process. See O'Bannon v. Town Court Nursing Center, Inc., 447 U.S. 773, 778 n. 6, 100 S.Ct. 2467, 2471, 65 L.Ed.2d 506 (1980); Town Court Nursing Center, Inc. v. Beal, 586 F.2d 266 (3d Cir. 1978). At the close of the hearing, the district court dismissed Northlake's complaint with prejudice on the grounds that the hospital failed to establish subject matter jurisdiction and failed to state a claim upon which relief could be granted.
 
 
 10
 Northlake submitted an amended complaint to the district court on September 4, 1980, and renewed its motion for injunctive relief. In the amended complaint, Northlake revised its jurisdictional statement to conform to the position that it had taken during oral argument on defendants' motion to dismiss. The hospital also revised and clarified its due process claim. The amended complaint thus alleged that the Federal Defendants violated the hospital's constitutional rights by: 1) failing to provide Northlake with prior notification of the new set of deficiencies (i. e., deficiencies found during the January 1980 survey); 2) failing to allow Northlake to submit a plan for achieving compliance with those deficiencies; 3) failing to provide an "exit interview;" and 4) failing to permit Northlake to submit additional evidence after notification of the new deficiencies.
 
 
 11
 When the court refused to accept the amended complaint because the previous action had been dismissed with prejudice, Northlake made an oral motion pursuant to Rule 59(e) of the Federal Rules of Civil Procedure to have the court reconsider its August 20 judgment dismissing the complaint. Since Rule 59(e) requires that a motion to alter or amend a judgment be filed within 10 days of the judgment, the Federal Defendants argued that Northlake's motion was untimely. Northlake responded that the relief it requested could also be granted under Rule 60(b). The district court concluded, however, that Northlake's Rule 59(e) motion was not timely and that Rule 60(b) was not available to cure the jurisdictional defect.
 
 
 12
 Northlake filed this appeal on September 8, 1980. Pursuant to an order of this court dated October 7, 1980, defendants have restored Northlake's provider status retroactive to August 8, 1980, and have honored the hospital's Medicare claims pending a decision by the court on this matter.
 
 II.
 
 13
 In Weinberger v. Salfi, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), the Supreme Court held that a plaintiff challenging the denial of Social Security benefits on constitutional grounds could not establish jurisdiction in the district court under 28 U.S.C. § 1331(a) (1970). The basis for this restriction on federal question jurisdiction was the third sentence of 42 U.S.C. § 405(h) (1970) which provides that "no action against the United States, the Secretary or any officer or employee thereof shall be brought under (§ 1331 et seq.) of Title 28 to recover on any claim arising under (Title II of the Social Security Act)."[5] Although the language of § 405(h) only addresses claims arising under Title II of the Social Security Act, the Court concluded that constitutional claims resulting from the denial of Title II benefits were covered by the 405(h) restriction. Thus, the Court explained,
 
 
 14
 (N)ot only is it Social Security benefits which appellees seek to recover, but it is the Social Security Act which provides both the standing and the subjective basis for the presentation of their constitutional contentions.... To contend that such an action does not arise under the Act whose benefits are sought is to ignore both the language and substance of the complaint and the judgment.
 
 
 15
 Id. at 760-61, 95 S.Ct. at 2464. The Salfi Court emphasized that § 405(h) does not preclude all constitutional challenges to the provisions of the Social Security Act, but "simply require(s) that (such claims) be brought under the jurisdictional grants contained in the Act." Id. at 762, 95 S.Ct. at 2465.
 
 
 16
 Subsequent efforts to apply the reasoning of Salfi to disputes arising under Title XVIII of the Social Security Act have resulted in a conflict among the judicial circuits.[6] In Trinity Memorial Hospital of Cudahy, Inc. v. Associated Hospital Services, 570 F.2d 660 (7th Cir. 1977), this court agreed that Salfi "precludes the use of 28 U.S.C. § 1331 as a jurisdictional basis" for Medicare provider reimbursement disputes. Although Northlake's claim in the instant case involves the procedures for terminating a provider agreement rather than the procedures for obtaining reimbursement pursuant to such an agreement, the result with respect to these two procedures should be the same. Under Salfi and Trinity, Northlake's allegation of federal question jurisdiction is defective.
 
 
 17
 The Federal Rules of Civil Procedure, however, allow for the liberal amendment of pleadings, particularly to cure jurisdictional defects. See 3 Moore's Federal Practice § 15.10 at 15-140 (2d ed. 1980). Rule 15(a) provides that "a party may amend his pleading once as a matter of course at any time before a responsive pleading is served." It is well settled in this circuit that a motion to dismiss is not a responsive pleading. Fuhrer v. Fuhrer, 292 F.2d 140 (7th Cir. 1961). Therefore, Northlake was entitled to amend its complaint "as a matter of course" at any time prior to the dismissal of the action. Northlake's effort to assert alternative jurisdictional grounds, as demonstrated by its written memorandum in opposition to defendant's motion to dismiss and oral argument on that motion, was sufficient in our view, to effectively amend the complaint and to foreclose dismissal of the suit on the basis of Northlake's defective allegation of federal question jurisdiction.[7]
 
 
 18
 It remains necessary, however, to determine whether the amended complaint, which alleges jurisdiction pursuant to 42 U.S.C. § 405(g) (1979), confers subject matter jurisdiction on the district court. Title XVIII of the Social Security Act specifically states that an institution dissatisfied with a final decision by the Secretary to terminate its Medicare provider agreement may obtain judicial review of the matter in accordance with 42 U.S.C. § 405(g). 42 U.S.C. § 1395ff(c) (1979).[8] Under the terms of Section 405(g),[9] review is available only if three requirements have been satisfied: 1) an action was brought "after any final decision of the Secretary made after a hearing to which (the provider) was a party;" 2) the action was commenced within 60 days after the mailing of the notice of decision by the Secretary or within such time as the Secretary may allow; and 3) the action was filed in an appropriate court. 42 U.S.C. § 405(g) (1979).
 
 
 19
 The Supreme Court has found that the first requirement, a final decision by the Secretary after a hearing, is "central to the requisite grant of subject matter jurisdiction" under Section 405(g). Salfi, 422 U.S. at 764, 95 S.Ct. at 2466. In the instant case, Northlake sued for injunctive relief before any final decision after a hearing could be obtained. Although Northlake's apparent failure to exhaust available administrative remedies would seem, on its face, to defeat Section 405(g) jurisdiction, Northlake argues that this case falls within an exception to the final decision requirement.
 
 
 20
 In Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Supreme Court explained that there are two prerequisites to a final decision by the Secretary. The first such prerequisite is a purely jurisdictional requirement which cannot be waived, namely the presentation of a claim for benefits to the Secretary. The Court noted that "absent such a claim there can be no 'decision' of any type. And some decision by the Secretary is clearly required by the statute." Id. at 329, 96 S.Ct. at 900.
 
 
 21
 Northlake satisfied this first prerequisite by presenting an appropriate claim to the Secretary upon receipt of the termination notice. In a letter dated July 28, 1980, the hospital administrator demanded immediate rescission of the termination order on the ground that the cited deficiencies did not affect the quality of care provided by the hospital or the safety of its patients. Although the administrator did not deny the existence of Life Safety Code violations, his general challenge to the termination decision was adequate in this case to meet the "presentation of claim" requirement even though there was no genuine dispute as to the existence of the deficiencies. Here, instead, there is a dispute as to the length of time the institution should be given to achieve compliance.
 
 
 22
 The second prerequisite to a "final decision" by the Secretary requires the exhaustion of administrative remedies; but, there are circumstances under which this element can be waived. If the Secretary determines that additional administrative review would be futile either because the agency's needs have been satisfied or because the requested relief is beyond the agency's power to confer the Secretary may waive the exhaustion requirement at any stage of the administrative process. Salfi, 422 U.S. at 765-67, 95 S.Ct. at 2466-67. Similarly, if the claimant raises a constitutional challenge which is entirely collateral to his claim of entitlement, and "the claimant's interest in having ... (the) issue resolved promptly is so great that deference to the agency's judgment is inappropriate," the court may waive the exhaustion requirement. Eldridge, 424 U.S. at 330, 96 S.Ct. at 900. In the case of waiver either by the Secretary or the court, a claimant who has satisfied all of the other prerequisites for jurisdiction under Section 405(g) may obtain judicial review without exhausting available administrative remedies.
 
 
 23
 In the instant case, Northlake argues that the due process violations alleged in its complaint represent colorable constitutional claims sufficient to mandate a waiver of the exhaustion prerequisite to Section 405(g) jurisdiction. Northlake specifically charged that the Federal Defendants violated the hospital's right to due process by failing (1) to conduct a hearing prior to the termination of Northlake's Medicare provider agreement, (2) to provide Northlake with prior notification of the "new" deficiencies (of January 1980), (3) to allow Northlake to submit a plan for achieving compliance with those deficiencies, (4) to provide an "exit interview" and (5) to permit Northlake to submit additional evidence after notification of the new deficiencies.
 
 
 24
 We have examined each of these allegations, however, and are persuaded that Northlake failed to satisfy its burden. The mere assertion of a constitutional claim is not enough; the record before the court must present a colorable constitutional claim. Kechijian v. Califano, 621 F.2d 1, 5 (1st Cir. 1980). The facts contained in this record demonstrate that Northlake's charges do not rise to the level of colorable constitutional claims and could not confer subject matter jurisdiction on the district court pursuant to 42 U.S.C. § 405(g) (1979).
 
 
 25
 Northlake's first claim, that due process requires a hearing prior to the termination of Medicare benefits, has been in a similar context rejected by the Supreme Court. In Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Court examined the procedures governing administrative review of disability claims under the Social Security Act. These procedures, which are almost identical to the administrative prescriptions for Medicare providers, allow only for hearings after the denial of the disability claims. The Court nevertheless determined that these provisions satisfy the requirements of due process. In arriving at this conclusion, the Court examined the statutory scheme in light of the particular individual and governmental interests at stake:
 
 
 26
 First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such an interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
 
 
 27
 Eldridge, 424 U.S. at 335, 96 S.Ct. at 903. Under these criteria, we believe that Medicare providers, like disability claimants in Eldridge, cannot raise a colorable constitutional claim of entitlement to a pre-termination hearing.
 
 
 28
 The private interest involved in the termination of a Medicare provider agreement is less weighty than the interest of a disability claimant. Town Court Nursing Center, Inc. v. Beal, 586 F.2d 266 (3d Cir. 1978). The provider, although it plays a virtually indispensible role in the administration of Medicare benefits, is not the intended beneficiary of the Medicare program. Id. at 277. Obviously, the termination of Medicare assistance has a financial impact (potentially severe in many instances) on the institution. But a provider's financial need to be subsidized for the care of its Medicare patients is only "incidental to the purpose and design of the (Medicare) program." Geriatrics, Inc. v. Harris, 640 F.2d 262 (10th Cir. 1981). Thus, a terminated provider can still obtain revenue from the care of private patients. "The unfortunate reality that (the institution) will probably encounter difficulty operating at capacity is not of constitutional significance." Id. at 8. Accord, Town Court, 586 F.2d at 277; Case v. Weinberger, 523 F.2d 602, 607 (2d Cir. 1975).
 
 
 29
 The risk of erroneous deprivation of provider status is also quite manageable. As the Court of Appeals for the Third Circuit explained in Town Court :
 
 
 30
 The decision not to renew a provider agreement is an easily documented, sharply focused decision in which the issues of credibility and veracity play little role. It is based in most cases upon routine, standard, unbiased reports by health care professionals. Those professionals evaluate the provider in light of well-defined criteria that were developed in the administrative rule making process. Written submissions are adequate to allow the provider to present his case. Given the extensive documentation that the provider is able to submit in response to the findings of the survey teams, the provider is unlikely to need an evidentiary hearing to present his position more effectively.
 
 
 31
 Town Court, 586 F.2d at 277.
 
 
 32
 Finally, the Government's interest in expeditious provider termination procedures is twofold. The Secretary's responsibility for insuring the safety and care of elderly and disabled Medicare patients is of primary importance. In addition, the government has a strong interest in minimizing the expenses of administering the Medicare program. Courts which have reviewed this problem agree that the cost of providing pre-termination hearings to all disgruntled providers would be excessively high. Town Court, 586 F.2d 278. Hence, when the Government's strong interest in simplicity and expedition and the relatively small risk of error are balanced against the provider's interest, a provider's due process rights appear to be adequately protected by a post-termination hearing. Town Court Nursing Center v. Beal, 586 F.2d 266 (3d Cir. 1978).
 
 
 33
 Although the Supreme Court has never directly addressed the pre-termination hearing question in the context of terminating a Medicare provider, the Court recently delivered itself of persuasive, if not dispositive, dicta on the subject. Thus, in O'Bannon v. Town Court Nursing Center, 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980), the Court held that Medicaid patients were not entitled to a hearing prior to their transfer from an institution whose provider agreement had been terminated. The Court stated that, "the patients argue that they are third party beneficiaries of the provider agreement ... and that this status somehow entitles them to more than (the provider) itself is entitled to namely, a pretermination hearing." Id. at 785 n.17, 100 S.Ct. at 2475. This observation by the Court in O'Bannon, as well as the Eldridge due process analysis, makes it clear that the post-termination hearing provided under Medicare regulations adequately meets a provider's due process objections. Accord, Geriatrics, Inc. v. Harris, 640 F.2d 262 (10th Cir. 1981); Royal Manor, Inc. v. Califano, 620 F.2d 304 (6th Cir. 1980); Green v. Cashman, 605 F.2d 945 (6th Cir. 1979); Canton Ridge Nursing Home, Inc. v. Califano, 596 F.2d 608 (4th Cir. 1979); Case v. Weinberger, 523 F.2d 602 (2d Cir. 1975); Rockhill Care Center, Inc. v. Harris, 502 F.Supp. 1227 (W.D.Mo.1980). Accordingly, Northlake's claim to a pre-termination hearing does not rise even to the level of a colorable constitutional claim, and the principal asserted jurisdictional basis of the complaint must therefore fail.[10]
 
 
 34
 Northlake also argues that the Federal Defendants failed to provide the hospital with prior notice of the deficiencies which caused the termination and refused to allow Northlake to respond to those deficiencies. Specifically, Northlake maintains that it should have been allowed to submit a plan for achieving compliance with respect to the deficiencies cited in the termination order, should have been granted an "exit interview" and should have been permitted to submit additional evidence on the deficiencies. We do not believe, however, that based on the record these allegations have enough substance to constitute colorable constitutional claims sufficient to confer Section 405(g) jurisdiction.
 
 
 35
 Title XVIII of the Social Security Act authorizes the Secretary to terminate an agreement with a provider which does not substantially comply with the appropriate conditions of participation. 42 U.S.C. § 1395cc(b)(2) (1979). The deficient provider may temporarily continue to receive Medicare funds, however, if the existing deficiencies do not jeopardize the health and safety of the patients or seriously limit the provider's capacity to render adequate care. The facility must also submit an acceptable plan for achieving compliance within a reasonable period of time. 42 CFR § 405.1907(a) (1980). Although the provider is ordinarily expected to take steps toward achieving compliance within 60 days of the notice of the deficiency, the time allowed depends upon the nature of the violation and the facility's ability to provide safe and adequate care. 42 CFR § 405.1907(b) (1980). If the Secretary does not approve the provider's plan for achieving compliance or finds that the deficiencies affect the service rendered by the provider and the safety of its patients, the Secretary must give the provider fifteen days notice before terminating the agreement. 42 CFR § 489.53(b)(1) (1980).
 
 
 36
 In the instant case, Northlake was first notified that it was not in compliance with the Medicare Physical Environment condition of participation in November 1979. At that time, the Federal Defendants issued a warning that unless an acceptable plan of compliance was submitted or the deficiencies corrected, Northlake's provider agreement would be terminated. A DHHS official made subsequent visits to Northlake in January and May 1980 to determine if the hospital was making progress toward compliance. But it was not until June 1, 1980, more than six months after receipt of the termination warning, that Northlake reported to the Federal Defendants on the status of the deficiencies. Although many of the minor problems had been corrected or eliminated, two serious Life Safety Code violations remained. Northlake indicated that exit violations would be corrected as soon as funds were available and asked the Federal Defendants to waive the egress violation.
 
 
 37
 Shortly thereafter, the Federal Defendants notified Northlake that, because the hospital failed to meet the requirements for participation in the Medicare program, its provider agreement would be terminated on August 8, 1980. The letter, which included a specific list of deficiencies, also contained a description of the administrative appeal process and encouraged Northlake to reapply to the Medicare program when it was once again in compliance with the conditions of participation. Northlake's administrator immediately made both a written and verbal request to the Federal Defendants to rescind the termination order. He also made a separate request for a prompt administrative hearing, but when it became obvious that the hearing would not take place prior to the effective date of termination, Northlake filed this lawsuit.
 
 
 38
 These facts establish that Northlake had more than adequate notice of the deficiencies which caused the termination of its provider agreement. The November 25 warning letter issued by the Federal Defendants included a specific list of deficient items, and the July 18 termination letter was accompanied by a similar list. At least two of the Life Safety Code violations discussed in the termination letter were also cited in the November warning letter.
 
 
 39
 Northlake argues that in addition to these two Life Safety Code violations, the termination letter relied on several new deficiencies found during the January 1980 survey and that the hospital did not receive adequate notice of these new items. Some evidence in the record, however, belies this claim. The hospital administrator's letter of June 1, 1980 was "in reply to (the Federal Defendants') letter of 25 November 1979 (and) subsequent visits by Mr. Paul Schneider (a DHHS official) on 4 January 1980 and 27 May 1980." This letter seems to indicate that Northlake was aware, if only on an informal basis, of the new deficiencies found during the DHHS follow-up inspections. But even if Northlake did not know of the subsequently reported violations, Northlake's argument that it lacked prior notification does not rise to the level of a colorable constitutional claim. Advance notice and subsequent correction of the January deficiencies would not have altered the fact that Northlake still failed to comply with the exit and egress standards of the Life Safety Code. These two eight month old violations alone were sufficient to justify the termination of Northlake's provider agreement. 42 U.S.C. § 1395cc(b)(2) (1979) and 42 CFR § 489.53(a)(3) (1980).
 
 
 40
 Similarly, the record does not support the allegation that Northlake was denied an opportunity to respond to the deficiencies causing the termination of its provider agreement. Despite the indication in the regulations that a provider is expected to take some step toward achieving compliance within 60 days of the notice of deficiency, Northlake waited more than six months to submit a plan of compliance. The notice of termination issued shortly thereafter indicated that the Secretary found this plan unacceptable. Northlake nevertheless maintains that it should have been given the opportunity to submit a plan for achieving compliance as to the more recently reported deficiencies. Even if Northlake had been able to submit an acceptable plan within a reasonable period (and this was doubtful in view of the lengthy delay in submitting its first plan and the financial problems plaguing the hospital), two serious Life Safety Code violations would remain uncorrected. Thus, an acceptable plan of compliance directed toward the new deficiencies could not have prevented the termination. A claim based on an alleged absence of an opportunity to submit such a plan does not rise to the level of a colorable constitutional claim.
 
 
 41
 Northlake also contends that it was denied the opportunity to respond to the deficiencies causing the termination because the Federal Defendants failed to conduct an "exit interview." This claim is not based on a provision in the Social Security Act or the Medicare regulations, but finds its origins in the words of the Third Circuit Court of Appeals in Town Court Nursing Center v. Beal, 586 F.2d 266 (3d Cir. 1978). The court, discussing why a pre-termination hearing is not necessary for Medicare providers, concluded that written submissions are adequate to protect an institution's due process rights, and "in any event, there is ample opportunity to expand orally upon written submissions during the exit interview or in discussions during the survey itself." Id. at 277-78. But this language merely suggests that the exit interview is additional protection for the deficient provider rather than a constitutional entitlement. Since there is no indication in the complaint that written submissions were inadequate to present Northlake's position, the Federal Defendants' failure in this case to conduct an exit interview does not provide a basis for a colorable constitutional claim sufficient to confer jurisdiction on the district court pursuant to Section 405(g).
 
 
 42
 Northlake's final claim that it was denied an opportunity to submit additional evidence on the new deficiencies noted in the termination letter similarly lacks constitutional substance. First, there is no allegation in the complaint that Northlake ever offered such evidence to the Federal Defendants and no indication what that evidence might be. Second, it is highly unlikely that any such evidence would have had an appreciable impact on the Secretary's conclusion that the longstanding exit and egress Life Safety Code violations warranted termination of Northlake's provider agreement. Finally, the procedures governing post-termination administrative review freely allow for the presentation of such evidence and adequately protect a provider's due process rights.
 
 
 43
 We conclude that the allegations of Northlake's complaint do not constitute colorable constitutional claims sufficient to confer subject matter jurisdiction over this action pursuant to 42 U.S.C. § 405(g) (1979). But even if any of Northlake's allegations constitute "colorable" constitutional claims for jurisdictional purposes, the patent invalidity of these claims renders them at least equally dismissable for failure to state claims upon which relief can be granted. As a matter of law, therefore, on grounds of either or both jurisdictional failure and insufficiency of the pleadings, the judgment of the district court dismissing the complaint (together with the order denying reconsideration of that judgment) is affirmed.
 
 
 
 *
 We substitute the name Richard S. Schweiker, the successor to the original defendant, Patricia R. Harris, as Secretary of Health and Human Services pursuant to Fed.R.App.P. 43(c)
 
 
 **
 The Honorable John R. Bartels, Senior District Judge for the Eastern District of New York, is sitting by designation
 
 
 [1]
 The United States of America, the DHHS and the Secretary will hereinafter be referred to as the Federal Defendants
 
 
 [2]
 28 U.S.C. § 1331(a) (1976) (amended 1976 and 1980) provides:
 The district courts shall have original jurisdiction of all civil actions and arising under the Constitution, laws or treaties of the United States.
 
 
 [3]
 42 U.S.C. § 405(h) (1976) provides:
 The findings and decisions of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 41 of Title 28 (28 U.S.C. § 1331(a) (1976)) to recover on any claim arising under this subchapter.
 
 
 [4]
 42 U.S.C. § 405(g) (1976) provides:
 Any individual, after any final decision of the Secretary made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Secretary may allow. Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business, ....
 
 
 [5]
 As the Supreme Court noted in Salfi, the language of Section 405(h) actually bars actions under 28 U.S.C. § 41 (1970). At the time Section 405(h) was enacted, however, Section 41 contained all of the grants of jurisdiction to the United States district courts under Title 28 including the predecessor to Section 1331(a). Salfi, 422 U.S. at 756, n.3, 95 S.Ct. at 2462
 
 
 [6]
 At least three circuits ruled that the Supreme Court's reasoning in Salfi did not necessarily preclude § 1331 jurisdiction in these cases. See e. g., Humana of South Carolina, Inc. v. Califano, 590 F.2d 1070 (D.C.Cir.1978) (§ 405(h) is not summoned into play when suit is brought to vindicate an interest in procedural regularity); Dr. John T. MacDonald Foundation, Inc. v. Mathews, 554 F.2d 714 (5th Cir. 1977), vacated, 571 F.2d 328, cert. denied, 439 U.S. 893, 99 S.Ct. 250, 58 L.Ed.2d 238 (1978) (§ 1331 jurisdiction exists for claims arising prior to the availability of adequate statutory review under the Act); St. Louis University v. Blue Cross Hospital Service, Inc., 537 F.2d 283 (8th Cir.), cert. denied sub nom. Faith Hospital Ass'n. v. Blue Cross Hospital Service, Inc., 429 U.S. 977, 97 S.Ct. 484, 50 L.Ed.2d 584 (1976) (§ 405(h) does not preclude district court jurisdiction of due process challenges to the procedures adopted by the Secretary to determine Medicare reimbursements). The Second Circuit concluded that Salfi effectively cut off federal question jurisdiction under Section 1331(a) in these cases, but found that the Court of Claims had exclusive jurisdiction to review reimbursement disputes. South Windsor Convalescent Home, Inc. v. Mathews, 541 F.2d 910 (2d Cir. 1976). Accord, Whitecliff, Inc. v. United States, 536 F.2d 347 (Ct.Cl.1976), cert. denied, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977)
 
 
 [7]
 Since the issue is not relevant to our disposition of this case, we express no opinion on the propriety of Northlake's effort to amend the complaint after dismissal of the action
 
 
 [8]
 42 U.S.C. § 1395ff(c) (1979) provides:
 Any institution or agency dissatisfied with any determination by the Secretary that it is not a provider of services, or with any determination described in section 1395cc(b)(2) of this title, shall be entitled to a hearing thereon by the Secretary (after reasonable notice and opportunity for hearing) to the same extent as is provided in section 405(b) of this title, and to judicial review of the Secretary's final decision after such hearing as is provided in section 405(g) of this title.
 
 
 [9]
 See note 4 supra
 
 
 [10]
 In supporting its claim for a pre-termination hearing, Northlake relied heavily on this court's decision in Hathaway v. Mathews, 546 F.2d 227 (7th Cir. 1976). In that case, we held that the Secretary could not terminate Medicaid payments to a nursing home until the home had been given notice of the charges and a hearing in which the validity of the charges could be challenged. The result was carefully tailored to a "balancing of factors peculiar to (that) litigation," Id. at 232, and must be limited to those facts in light of the Supreme Court's decisions in Eldridge and O'Bannon
 Since Hathaway is factually distinguishable from the instant case in several respects, Northlake's reliance on the case is misplaced. Unlike Northlake, the nursing home in Hathaway had no opportunity to obtain administrative review of the Secretary's decision because the applicable regulations did not then provide for a post-termination hearing. Moreover, the nursing home in Hathaway received no advance notice of the alleged deficiencies requiring termination of the provider agreements, and there was substantial doubt whether the home was, in fact, out of compliance with Medicaid conditions of participation. While these substantial factual differences render the Hathaway result inapplicable to Northlake's situation, the existence of Hathaway might suggest that Northlake's claim for a pretermination hearing was sufficiently plausible to be "colorable." But whatever its level of "plausibility," we think the claim is legally defective in that it fails to state a claim upon which relief can be granted.