In the Matter of the Contested Case of
**GOOD NEIGHBOR CARE CENTERS,
INC., et al., Relators,**
v.
**MINNESOTA DEPARTMENT OF
HUMAN SERVICES,**
Respondent.

No. C5–88–612.

Court of Appeals of Minnesota.

Aug. 16, 1988.

Motion to Amend Case Title Denied
Sept. 28, 1988.
Review Denied Oct. 19, 1988.

K. Craig Wildfang, Minneapolis, for relators.

Hubert H. Humphrey, III, Atty. Gen., John L. Kirwin, Asst. Atty. Gen., Kim Buechel Mesun, Sp. Asst. Atty. Gen., St. Paul, for respondent.

Maureen W. Bellis, Sp. Asst. Atty. Gen., St. Paul, for amicus curiae Minnesota Bd. on Aging.

Paul C. Clabo, Legal Aid Society of Mpls., Minneapolis, for amici curiae Minnesota Senior Federation and Minnesota Alliance for Health Care Consumers.

Heard, considered and decided by FORSBERG, P.J., and LANSING and SCHULTZ *, JJ.

## OPINION

LANSING, Judge.

Respondent Department of Human Services (DHS) imposed a 20% reduction of medical assistance payments on relator Good Neighbor Care Center (GNCC) and other nursing homes represented by relator Care Providers, Inc., based on their practice of charging private paying residents the rates they anticipated would result from pending appeals of DHS approved rates. A contested case proceeding followed, and GNCC and Care Providers appeal the decision of the Commissioner of DHS granting summary disposition upholding DHS's action.

## FACTS

Relator Care Providers of Minnesota is a trade association representing some 250 state-licensed nursing homes, including 27 operated by GNCC, which are certified to participate in the federal Medicaid program (known as Medical Assistance (MA) in Minnesota). Minnesota's Equalization Law, Minn.Stat. § 256B.48, subd. 1 (1986), requires nursing homes to charge private paying residents the same rates paid for the care of MA residents. Pending constitutional challenges to the law, members of Care Providers' predecessor organization were permitted to charge higher rates to private paying residents, placing the amount over the MA rate in escrow. The nursing homes' constitutional challenge failed. *See Minnesota Ass'n of Health Care Facilities v. Minnesota Dept. of Public Welfare,* 742 F.2d 442 (8th Cir.1984), *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985). According to amici Minnesota Board on Aging, Minnesota Senior Federation, and Minnesota Alliance for Health Care Consumers, numerous problems arose in returning escrowed funds. A 1986 law compelled return of those funds by July 1, 1986. *See* 1986 Minn.Laws ch. 420, § 16.

The implementation of the Equalization Law has remained problematic, particularly in the determination of MA rates. Rates paid to nursing homes are based in part on the nursing home's allowable operating costs, as determined by DHS. Those determinations have resulted in frequent ap-

---

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

peals, exacerbated by a 1983 legislative enactment "overhauling" the rate-setting mechanism. Because of the volume of appeals and DHS's inadequate staffing, rate appeals frequently take years to resolve, although the backlog is now diminishing.

Many of the appeals result in higher MA rates, which nursing homes are permitted to charge retroactively to their private paying residents. *See* Minn.R. 9549.0080, subp. 4. However, by the time the appeals are resolved, private paying residents may have died or become insolvent, making "most, if not all" retroactive charges uncollectible, although some can be recovered as bad debt expenses.

Because of this problem, in early 1986 GNCC began charging its private paying residents the rate it sought on pending appeals, placing the excess over the MA rate in escrow accounts until the appeals were resolved. By letter of January 22, 1986, DHS informed GNCC that the practice violated the Equalization Law, and that DHS would take action if the violation continued. Counsel for GNCC responded that the practice was legal.

When subsequent correspondence did not resolve the problem, in March 1986 DHS began serving "Notices of Agency Action" on nursing homes, including those operated by GNCC. The notices gave the nursing homes 20 days to correct the violation, after which DHS would reduce their MA payment rate by 20% until the violation was corrected. The notices also informed the nursing homes that they could request a contested-case hearing within 20 days, but that the 20% reduction would remain in effect despite a pending appeal. The notice contained the name and telephone number of a DHS staff member to contact if there were any questions.

Although it admitted that it was charging private paying residents more than the approved MA rate, GNCC immediately requested a contested case hearing and also an expedited hearing on its MA rates. DHS set a contested case hearing, but disputed that GNCC was entitled to an expedited hearing on its rate appeals. GNCC subsequently agreed to stop charging more than the MA rate in return for withdrawal of the DHS Notice of Agency Action.

The contested case was scheduled to decide these issues: (1) whether GNCC's charging practices violated the Equalization Law; (2) whether GNCC was entitled to expedition of its rate appeals; (3) whether DHS's interpretation and implementation of various provisions of the Equalization Law constituted invalid, unpromulgated rules; and (4) whether DHS's enforcement activity violated due process. DHS moved for summary disposition on the ground that there were no genuine issues of material fact and it was entitled to summary disposition as a matter of law.

The ALJ recommended summary disposition, holding that GNCC's charging practices violated the Equalization Law, but that DHS's interpretation of the law to allow imposition of the 20% rate reduction pending appeal constituted an invalid, unpromulgated rule. The ALJ ruled in favor of DHS on the other claims.

The Commissioner adopted the ALJ's decision in favor of DHS, and also held that DHS's interpretation of the rate reduction provision did not constitute an unpromulgated rule. Because the statute requires DHS's enforcement activity, the Commissioner concluded that the due process issues constituted a challenge to the validity of the statute which she was without authority to address.

GNCC and Care Providers appeal by writ of certiorari.

## ISSUES

1. Does GNCC's practice of charging private paying residents anticipated post-appeal rates violate the Equalization Law?

2. Do DHS's interpretation and implementation of the Equalization Law constitute invalid, unpromulgated rules?

3. Is DHS's interpretation of the Equalization Law invalid as unreasonable?

4. Does the imposition of rate reductions during the pendency of an appeal violate procedural due process?

5. Does the interpretation of the Equalization Law to preclude charging anticipated post-appeal rates constitute an unconstitutional taking?

## ANALYSIS

Under Minn.Stat. § 14.69 (1986), this court may reverse or modify the agency's decision if it violates constitutional provisions, exceeds the agency's statutory authority or jurisdiction, is made on unlawful procedure, is affected by error of law, or is arbitrary. Similar to Minn.R.Civ.P. 56, Minn.R. 1400.5500(K) provides for summary disposition of a contested case if "there is no genuine issue as to any material fact." Although this court will defer to DHS's decision on matters within its technical expertise, this deference does not extend to questions of law. *See* G. Beck, L. Bakken & T. Muck, *Minnesota Administrative Procedure* § 13.4.1 (1987) ("Beck").

## I

Under the Equalization Law, a nursing home is not eligible to receive medical assistance payments unless it refrains from:

[c]harging private paying residents rates for similar services which exceed those which are approved by the state agency for medical assistance recipients as determined by the prospective desk audit rate * * *.

Minn.Stat. § 256B.48, subd. 1(a) (1986). The Commissioner determined that GNCC violated the statute by charging private paying residents the rate it sought in pending rate appeals.

GNCC argues that the statute is ambiguous because the term "prospective desk audit rate" is not defined and could include the rate approved after appeal. This argument appears to be based on a selective reading of the statutory language; as DHS points out, the statute is not ambiguous because at any given time, only one prospective desk audit rate has been "approved by the state agency." Because statutes should be construed to give effect to all their provisions, Minn.Stat. § 645.16 (1986), the Commissioner correctly concluded that the plain language of the statute

precludes charging any other rate while an appeal is pending.

Even if the term were ambiguous, the result would be the same. Ambiguous statutes are to be construed according to the legislative intent, as reflected in the statute's purpose, the consequences of any particular interpretation, and administrative interpretations. *Id.* It is presumed that the legislature intends the entire statute to be effective, intends to favor the public interest over private interests, and does not intend to violate the constitution or produce an unreasonable result. Minn. Stat. § 645.17.

The purposes of Minn.Stat. § 256B.48, subd. 1, have been described as follows:

The equalization provision: (1) may reduce discrimination against Medicaid recipients in gaining entry to nursing homes by eliminating the incentive to discriminate; (2) tends to alleviate the "stigma" attached to receiving welfare benefits; (3) permits private pay residents to stretch their savings farther and thereby stay off welfare; (4) promotes the fundamental notion of fairness that one should pay equal rates for equal services; and (5) eases the resentment of private pay patients directed toward Medicaid recipients.

*Highland Chateau v. Minnesota Dept. of Public Welfare,* 356 N.W.2d 804, 808 (Minn.Ct.App.1984), *pet. for review denied* (Minn. Feb. 6, 1985) (quoting *Minnesota Ass'n of Health Care Facilities, Inc. v. Minnesota Dept. of Public Welfare,* Nos. 3–77–467 and 3–78–88, slip. op. at 15 (D.Minn. April 26, 1983)).

GNCC argues that interpreting the statute to preclude charging higher rates pending appeal would be unreasonable and contrary to the purpose of promoting equal rates for equal services, because the uncollectibility of retroactive charges results in private residents actually paying less than MA residents for the same services. However, some of the uncollectible charges can be recovered as bad debt costs under Minn.R. 9549.0070, subp. 4, and DHS's in-

terpretation would promote the statutory purpose of allowing private paying residents to stretch their savings further and avoid welfare. Moreover, nursing homes do not always win their appeals or receive the full requested increase, and in those cases the private paying residents would pay more for the same services until the escrowed funds were returned.

DHS's interpretation is also supported by related statutes and rules. Minn.Stat. § 256B.50, subd. 1 (1986) provides:

> [r]egardless of any rate appeal, the rate established shall be the rate paid and shall remain in effect until final resolution of the appeal * * *.

Because § 256B.50 concerns appeals of medical assistance payment rates, the inference is that the MA rate in effect pending appeal is the rate to which nursing homes must equalize under Minn.Stat. § 256B.48.

Similarly, 1986 Minn.Laws ch. 420, § 16, which requires refund of excess charges escrowed pending resolution of constitutional challenges to the Equalization Law, provides that the amount refunded

> shall be equal to the difference between the prospective desk audit rate, *before appeal resolutions*, established by the commissioner and the actual amount charged to each private paying resident.

GNCC argues that the absence of similar language in Minn.Stat. § 256B.48 supports the inference that the legislature did not intend that section to require equalization to the pre-appeal rate. However, chapter 420 later distinguishes "prospective desk audit rate" from "amount not in dispute" in permitting only partial refunds for appeals of pre–1983 rates. That provision indicates that "prospective desk audit rate" means the disputed rate, rather than the rate after appeal resolution.

Finally, the rules promulgated by DHS to implement § 256B.48 are consistent with its interpretation. Minn.R. 9549.0080, subp. 4 (1987) requires nursing homes to notify private paying residents of "the total payment rate established by the commissioner that will be charged pending appeal." This language mirrors the requirement of Minn.Stat. § 256B.48, subd. 1, that nursing homes not charge rates "which exceed those which are approved by the state agency."

The rule further provides that

> [i]f notice is given and the nursing home prevails in the appeal, the nursing home may adjust the private payment rate retroactive to the first day of the period covered by the appeal or to the 31st day after giving notice, whichever is later.

Minn.R. 9549.0080, subp. 4. It would make no sense to provide specifically for retroactive adjustment if nursing homes are allowed to charge anticipated post-appeal rates pending resolution of the appeal.

GNCC argues that DHS's interpretation is contrary to Minn.R. 9549.0070, subp. 2, which requires that the MA payment rate "not exceed the rate paid by private paying residents." However, that rule specifically does not apply to "retroactive adjustments" in the total payment rate.

## II

■ Minn.Stat. § 14.02, subd. 4 (1986) defines "rule" as

> every agency statement of general applicability and future effect * * * adopted to implement or make specific the law enforced or administered by it * * *.

Because interpretive rules "make specific" the law administered by agencies, they are subject to the rulemaking requirements of Minn.Stat. §§ 14.01–.69, the Administrative Procedure Act. Rules which are not promulgated in accordance with those procedures are invalid and cannot be used as the basis for agency action. *See generally Cable Communications Board v. Nor–West Cable Communications Partnership*, 356 N.W.2d 658, 667 (Minn.1984); Beck § 16.5.2.

■ In applying this rule, the court has distinguished interpretations which are consistent with the plain meaning of the statute or rule interpreted, and those which conflict with statutes or rules. *See, e.g., Cable Communications*, 356 N.W.2d at 667–68. If an interpretation is consistent with the plain meaning of the statute or

rule, the agency's action is authorized by the statute itself, and the fact that no rule was promulgated does not render that interpretation invalid, although it does not have the force and effect of law. *Application of Peoples Natural Gas Co.*, 389 N.W. 2d 903, 906 (Minn.1986).

GNCC argues that DHS's interpretations of three aspects of the Equalization Law constitute invalid, unpromulgated rules.

### A. "Prospective Desk Audit Rate"

■ GNCC argues that DHS's interpretation of this term constitutes invalid rulemaking because nothing in Minn.R. 9549.-0080 "puts a reasonable person on notice that the *post-appeal* prospective desk audit rate may not be charged." However, as discussed above, the statute and the rule speak of rates "approved" and "established" by DHS, and the rule contains a provision for retroactive charges if the agency prevails on appeal. DHS's interpretation that post-appeal rates cannot be charged pending resolution of the appeal is consistent with and required by the language of the statute and the rule, and any other interpretation would fail to give effect to that language. The interpretation therefore did not have to be promulgated. *Mapleton Community Home v. Minnesota Dept. of Human Services*, 391 N.W.2d 798, 801–02 (Minn.1986).

### B. 20% Reduction while Appeals Pending

■ If a nursing home violates the Equalization Law,

the commissioner shall issue an order requiring the nursing home to correct the violation. * * * If the violation is not corrected within [20 days] the commissioner may reduce the payment rate to the nursing home by up to 20 percent. The amount of the payment rate reduction shall be related to the severity of the violation, and shall remain in effect until the violation is corrected. The nursing home * * * may appeal the commissioner's action pursuant to the provisions of chapter 14 pertaining to contested cases.

Minn.Stat. § 256B.48, subd. 1. GNCC argues that DHS's interpretation of the statute to allow reduction while its contested case appeal was pending constitutes an unpromulgated rule.

The ALJ agreed, concluding that the interpretation constituted an unpromulgated rule because it was inconsistent with Minn. R. 9505.1980, subp. 3, which provides that sanctions shall not be imposed while a hearing on an appeal is pending. However, as the Commissioner concluded, that rule relates to sanctions for violations of the Medicaid Fraud Statute and mirrors the language of that statute. *See* Minn.Stat. § 256B.04, subd. 10; Minn.R. 9505.1760.

By contrast, Minn.Stat. § 256B.48, subd. 1, specifically provides that the rate reduction "shall remain in effect until the violation is corrected." Had the legislature intended to preclude sanctions pending appeal, it could have specifically so provided, as it did in Minn. Stat. § 256B.04, subd. 10. DHS's interpretation to allow sanctions pending appeal is consistent with the statutory language and therefore not an unpromulgated rule.

GNCC also argues that DHS was required to make rules defining how its discretion in setting the amount of the sanction would be exercised. GNCC cites no specific authority for its argument that rulemaking is required whenever statutes leave matters to agency discretion. Moreover, no issue concerning the amount of the reduction was raised below, and this court will not decide this question in the absence of a record on whether the severity of the violation justified the reduction.

### C. Expedited Hearing on Rate Appeals.

■ Under the Equalization Law,

[a] nursing home that charges a private paying resident a rate in violation of this clause is subject to an action by the state of Minnesota or any of its subdivisions or agencies for civil damages. A private paying resident * * * has a cause of action for civil damages against a nursing home that charges the resident rates in violation of this clause. * * * A pri-

vate paying resident * * *, the state, * * * or a nursing home may request a hearing to determine the allowed rate or rates at issue in the cause of action. Within 15 calendar days after receiving a request for such a hearing, the commissioner shall request assignment of an administrative law judge * * * to conduct the hearing as soon as possible * * *. The administrative law judge shall issue a report within 15 calendar days following the close of the hearing. Minn.Stat. § 256B.48, subd. 1(a). GNCC argues that this statute provides a right to an expedited hearing on rate appeals following the notice of agency action, and that DHS's interpretation of the statute to apply only to provide hearing in connection with civil causes of action constitutes an invalid, unpromulgated rule.

The essence of GNCC's argument is that if residents have "a cause of action" whenever nursing homes charge excessive rates, then a "cause of action" exists for purposes of the hearing provision once DHS notifies the nursing home that its rates are excessive. While "cause of action" may refer to the inchoate right to bring an action, the statutory language can not reasonably be interpreted as GNCC suggests. The purpose of the hearing is to "determine the allowed rate or rates *at issue* in the cause of action." *Id.* If the cause of action has not been brought, no rates can be at issue in it. Moreover, because the statute prohibits charging more than the "approved rate," the "correct" rate would not be at issue in an expedited hearing. Appeals of the approved rate are separately provided for in Minn.Stat. § 256B.50. DHS's interpretation of the statute to preclude expedited hearings of underlying rates appeals upon service of a Notice of Agency Action is not an invalid, unpromulgated rule.

### III

GNCC argues that DHS's interpretation of the Equalization Law is unreasonable and therefore invalid, because it "deprives nursing homes of money to which they are legally entitled," and that the reasonableness of DHS's interpretation is an issue of fact precluding summary disposition.

The reasonableness of a promulgated rule is tested against the purpose of the statute it implements. *Broen Memorial Home v. Dept. of Human Serv.*, 364 N.W.2d 436, 440 (Minn.Ct.App.1985). If DHS had actually promulgated its interpretation, the rule would be reasonable in light of the statutory purpose: the statute by its terms prohibits charging private paying residents more than the approved rate, and it is reasonable to require that nursing homes rather than residents bear the cost of delayed appeals.

Because the challenged "rules" were not actually promulgated, but are required by the plain language of the statute, GNCC's argument goes to the validity of the statute itself. Whether a statute is rationally related to a legitimate government purpose is a question of law. *Midway Manor Convalescent and Nursing Home, Inc. v. Adcock*, 386 N.W.2d 782, 787 (Minn.Ct.App.1986). Assuming, as GNCC alleges and the Commissioner accepted, that nursing homes are deprived of revenue which they might otherwise collect, it is still not unreasonable for the legislature to prefer this result over a system of escrowed funds which diminish the resources of private paying residents and may not be returned even if the rate appeal is unsuccessful. The statute, and DHS's interpretation of it, are not invalid as unreasonable.

### IV

GNCC argues that the imposition of a 20% payment rate reduction while an appeal of the Notice of Agency Action is pending violates procedural due process. Analysis of this issue requires determining whether GNCC has a property interest in its medical assistance payment rates, and whether the procedure afforded by DHS suffices to protect that interest.

DHS argues that GNCC has no property interest in prospective medical assistance reimbursement rates, relying on *Oberlander v. Perales*, 740 F.2d 116, 120 (2d Cir.1984), and *Grossman v. Axelrod*,

646 F.2d 768, 771 (2d Cir.1981). However, both cases relied on the holding of New York courts that no such interest exists under New York law, and DHS has not cited any similarities between New York and Minnesota medical assistance programs that would require the same result.

DHS also argues that because GNCC and other nursing homes voluntarily participate in the medical assistance program, and can choose not to participate if the prospective payment rate is insufficient, they have no property interest in prospective rates. *See Highland Chateau*, 356 N.W.2d at 811 (voluntariness precludes possibility of "taking"). While nursing homes may not have a property interest in any particular rate, they would appear to have a protectible interest in not having a pre-approved rate reduced as a sanction. Other courts have found a due process interest in continued participation in Medicaid programs. *See Patchogue Nursing Center v. Bowen*, 797 F.2d 1137, 1144–45 (2d Cir.1986), *cert. denied*, 479 U.S. 1030, 107 S.Ct. 873, 93 L.Ed.2d 828 (1987); *Case v. Weinberger*, 523 F.2d 602, 606 (2d Cir.1975). Although those cases concern total termination, that fact goes to the weight of the interest, not its existence.

The remaining question is whether DHS's interpretation of the statutory procedure violates due process. The "two indispensable components" of due process have been described as notice and an opportunity to be heard. *Oberlander*, 740 F.2d at 120. As the Supreme Court has stated, "the pretermination hearing * * * should be an initial check against mistaken decisions," and a full adversary hearing is rarely required. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 545, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985). An opportunity to respond in writing will suffice where the factual issues are straightforward and do not rest on credibility. *See Patchogue*, 797 F.2d at 1144 (due process does not require full pretermination hearing); *Case*, 523 F.2d at 608 (pretermination opportunity to respond in writing sufficient to put necessary facts before the agency).

The sufficiency of a given procedure is to be tested against (1) the private interest at stake; (2) the risk of erroneous deprivation of that interest and the extent to which additional procedural safeguards would reduce that risk; and (3) the governmental interest, including administrative convenience. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

Although nursing homes have an obvious interest in not having their medical assistance payments reduced by 20%, the fact that they are only incidental beneficiaries of the medical assistance program makes that interest "significantly less compelling." *Oberlander*, 740 F.2d at 121; *see also Northlake Community Hospital v. United States*, 654 F.2d 1234, 1242 (7th Cir.1981). Nor is there a substantial risk of erroneous deprivation. Because the statute prohibits charging more than approved MA rates, the only issue would be whether the nursing homes were charging private paying residents more than the approved rate. DHS's notice informs nursing homes of the asserted violation and allows them 20 days to respond to a staff member whose name and phone number are stated in the notice. Any dispute over the approved MA rate could be settled informally during that period, and a pre-reduction hearing would add little. *See Northlake*, 654 F.2d at 1242 (post-deprivation hearing sufficient where decision is based on easily documented fact issues and nursing home can make written submissions before termination). The government has a substantial interest in promptly halting violations of the Equalization Law without overburdening an already crowded administrative appeals process. DHS's interpretation of the statutory procedure does not violate due process.

V

GNCC argues that DHS's establishment of a permanent system which deprives nursing homes of their ability to collect post-appeal rates constitutes an unconstitutional taking of property to which they are legally entitled. Although this

issue was not raised below, it is undisputed that nursing homes are "legally entitled" to charge approved rates, and to charge post-appeal rates retroactively. They have no statutory right to charge those rates prospectively, and thus no right has been "taken." Furthermore, the voluntariness of the program "forecloses the possibility" that its implementation could result in a "taking." *Highland Chateau*, 356 N.W.2d at 811. If nursing homes do not want restrictions on what they can charge their private paying residents, and when they can charge it, they are free not to participate.

DECISION

AFFIRMED.